Slip op. 05-72

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

———————————————————
                                            :
NIPPON STEEL CORP., KAWASAKI STEEL          :
CORP., ThyssenKrupp ACCIAI SPECIALI         :
TERNI S.p.A. AND ACCIAI SPECIALI TERNI      :
(USA), INC.,                                :
                                            :
            PLAINTIFFS,                      :
                                            :
       V.                                   :        CONSOL. COURT NO. 01-00103
                                            :         PUBLIC VERSION
UNITED STATES,                              :
                                            :
            DEFENDANT,                       :
                                            :
       AND                                  :
                                            :
ALLEGHENY LUDLUM CORP., AK STEEL            :
CORP., BUTLER ARMCO INDEPENDENT             :
UNION, ZANESVILLE ARMCO INDEPENDENT         :
UNION, AND UNITED STEELWORKERS OF           :
AMERICA, AFL-CIO/CLC,                       :
                                            :
            DEFENDANT-                       :
            INTERVENORS.                     :
                                            :
———————————————————

[United States International Trade Commission's remand determination of a sunset review of countervailing and antidumping duty orders on grain-oriented silicon electrical steel affirmed in part, remanded in part]

Dated: June 15, 2005

*Gibson, Dunn & Crutcher, LLP* (*Joseph H. Price*), for plaintiffs Nippon Steel Corporation.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*Robert H. Huey*), for plaintiff Kawasaki Steel Corporation.

*Hogan & Hartson L.L.P.* (*Lewis Liebowitz*), for ThyssenKrupp Acciai Speciali Terni

S.p.A. and Acciai Speciali Terni (USA), Inc.

   *James M. Lyons*, Acting General Counsel, United States International Trade Commission; *Marc A. Bernstein*, Acting Assistant General Counsel, United States International Trade Commission (*Gracemary R. Roth-Roffy*), for defendant United States International Trade Commission.

   *Collier Shannon Scott, PLLC* (*Kathleen W. Cannon*, *Michael J. Coursey*, *Eric R. McClafferty*, *John M. Herrmann*, *Grace W. Kim*, and *David A. Hartquist*), for defendant-intervenors Allegheny Ludlum Corp., AK Steel Corp., Butler Armco Independent Union, Zanesville Armco Independent Union, and the United Steelworkers of America, AFL-CIO/CLC.

OPINION AND ORDER

EATON, *Judge*: This matter is before the court following remand to the United States

International Trade Commission ("ITC" or "Commission"). In *Nippon Steel Corp. v. United*

*States*, 27 CIT __, 301 F. Supp. 2d 1355 (2003) ("*Nippon IV*"), the court remanded, for a second

time, the ITC's sunset review[1] determination that material injury to an industry in the United

States would be likely to continue or recur by reason of dumped and subsidized imports of grain-

---

[1]        Sunset reviews are also known as "five-year reviews":

> 5 years after the date of publication of . . . a countervailing duty order . . . an antidumping duty order, or a notice of suspension of an investigation, . . . [or] a notice of injury determination under section 1675b of this title with respect to a countervailing duty order, or . . . a determination under this section to continue an order or suspension agreement, . . . the Commission shall conduct a review to determine, in accordance with section 1675a of this title, whether revocation of the countervailing or antidumping duty order or termination of the investigation suspended under section 1671c or 1673c of this title would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . and of material injury.

19 U.S.C. § 1675(c) (2000).

oriented silicon electrical steel[2] from Italy and Japan ("GOES" or "Subject Imports"). *See* Final

Determination Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review) (Feb. 2001) ("Sunset

Review").[3]  Pursuant to court remand, the ITC issued a second remand determination on March

16, 2004.  *See* Second Remand Determination, Invs. Nos. 701-TA-355 and 731-TA-659-660

---

[2]         Grain-oriented silicon electrical steel is

> a flat-rolled alloy steel product containing by weight at least 0.6
> percent of silicon, not more than 0.08 percent of carbon, not more
> than 1.0 percent of aluminum, and no other element in an amount
> that would give the steel the characteristics of another alloy steel,
> of a thickness of no more than 0.56 millimeters, in coils of any
> width, or in straight lengths which are of a width measuring at least
> 10 times the thickness . . . [of the steel].

Grain-Oriented Electrical Steel From Italy and Japan, 65 Fed. Reg. 41,433, 41,433 (ITA July 5,
2000) (final results of expedited sunset reviews of antidumping duty orders).  "GOES is used to
manufacture laminated cores for electrical transformers and other electrical devices."  Invs. Nos.
701-TA-355 and 731-TA-659-660 (Review): Grain-Oriented Electrical Steel from Italy and
Japan Staff Report at I-12.  The countervailing and antidumping duty orders in these sunset
reviews were issued in 1994 and published in the Federal Register at 59 Fed. Reg. 29,414 (ITA
June 7, 1994) (countervailing duty order on GOES from Italy), 59 Fed. Reg. 29,984 (ITA June
10, 1994) (antidumping duty order on GOES from Japan), 59 Fed. Reg. 41,431 (ITA Aug. 12,
1994) (antidumping duty order on GOES from Italy).

[3]         The ITC reached its original Sunset Review determination by an evenly divided
three-to-three vote of its Commissioners.  Title 19 U.S.C. § 1677(11) provides:

> If the Commissioners voting on a determination . . . are evenly
> divided as to whether the determination should be affirmative or
> negative, the Commission shall be deemed to have made an
> affirmative determination.

*Id*.

        In the original Sunset Review determination, the ITC sustained the existing antidumping
duty orders on GOES from Italy and Japan by finding that "revocation of the[se] antidumping
duty orders . . . would be likely to lead to continuation or recurrence of material injury to an
industry in the United States . . . ."  Sunset Review at 3.

(Review) (Mar. 16, 2004) ("Second Remand Determination"). For the reasons stated below, the court affirms portions of the Second Remand Determination and remands the remainder for further action in conformity with this opinion.

BACKGROUND

The background of this case has been fully rehearsed in *Nippon IV*, in which the court reviewed the ITC's first remand determination and found certain conclusions to be unsupported by substantial evidence.[4] *See* Grain-Oriented Silicon Electrical Steel From Italy and Japan, USITC Pub. 3585, Invs. Nos. 701-TA-355 and 731-TA-659-660 (Mar. 2003) (Review) (Remand) ("First Remand Determination").[5] There, the court instructed the ITC to

> revisit the evidence cited for its findings with respect to cumulation and likelihood of continuation or recurrence of material injury and satisfy its obligations with specific reference to the evidence it claims supports its conclusions and adequate explanations of its findings based on this evidence. The ITC shall also address the record evidence which "fairly detracts" from the weight of the evidence supporting the ITC's determinations.

---

[4] The court held that (1) substantial evidence did not support ITC's findings that, for cumulation purposes, (a) GOES imports would likely have a discernible adverse impact on the domestic industry upon revocation of the subject countervailing and antidumping duty orders; and (b) substantial evidence did not support ITC's findings that there likely would be a reasonable overlap of competition between the subject imports if the orders were revoked; and (2) findings underlying the determination that revocation of antidumping orders would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time were not supported by substantial evidence. *See generally Nippon IV*.

[5] The ITC was required in the First Remand Determination to employ the word "likely" so that it means "probable" or "more likely than not." *AG der Dillinger Huttenwerke v. United States*, 26 CIT 1091, 1101 & n.14 (2002) (not published in the Federal Supplement); *see also Usinor Industeel, S.A. v. United States*, 26 CIT 467, 474 (2002) (not published in the Federal Supplement).

*Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1385. The ITC responded to this instruction in the Second Remand Determination, which restated its original conclusions. *See* Second Remand Determination at 1.[6]

Plaintiffs Nippon Steel Corp. ("Nippon"), JFE Steel Corp.,[7] ThyssenKrupp Acciai Speciali Terni S.p.A. ("AST" or the "Italian producer") and Acciai Speciali Terni (USA), Inc.[8] (collectively, the "Plaintiffs") again challenge, as unsupported by substantial evidence, several of the ITC's determinations, including those relating to cumulation, likely volume, and likelihood of recurrence of material injury.[9] Defendant-Intervenors Allegheny Ludlum Corp., AK Steel Corp., Butler Armco Independent Union, Zanesville Armco Independent Union , and United Steelworkers of America, AFL-CIO/CLC (collectively "Defendant-Intervenors") maintain that

---

[6]    In the Sunset Review, Vice Chairman Okun and Commissioners Bragg and Hillman dissented. *See* Sunset Review at 21–27, 29–32. Vice Chairman Okun and Commissioner Hillman joined the Commission's adopted views on cumulation and dissented with respect to likelihood of material injury. Commissioner Bragg dissented with respect to both cumulation and injury. *See id*. at 3 n.1.

In the First Remand Determination, now-Chairman Okun and now-Vice Chairman Hillman dissented again with respect to material injury. *See* First Remand Determination at 1 n.2. In the Second Remand Determination, Chairman Okun and Vice Chairman Hillman again dissented, joined by Commissioner Daniel R. Pearson. *See* Second Remand Determination at 1 n.2.

[7]    JFE Steel Corp. was formerly known as Kawasaki Steel Corp. *See* Letter from Arent Fox Kintner Plotkin & Kahn, PLLC to Clerk of the Court of 4/23/03.

[8]    Acciai Speciali Terni (USA), Inc. [[
    ]]. Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review): Grain-Oriented Electrical Steel from Italy and Japan Staff Report at IV-4.

[9]    *See generally* Pls.' Comments on the Second Remand Determination of the U.S. Int'l Trade Comm'n.

the Commission's Second Remand Determination is supported by substantial evidence and should therefore be sustained.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I).


STANDARD OF REVIEW

The court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  It "requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that . . . 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Atl. Sugar*, 744 F.2d at 1562).  In conducting its review, the court's function is not to reweigh the evidence but rather to ascertain  "whether there was evidence which could reasonably lead to the Commission's conclusion . . . ." *Matsushita*, 750 F.2d at 933.  The possibility of drawing two inconsistent conclusions from the record evidence does not, in itself, prevent the ITC's determinations from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *Altx*, 370 F.3d at 1116.

DISCUSSION

On remand, the primary issue that the ITC was instructed to reexamine related to whether substantial evidence supported its likely volume findings as they affected cumulation and material injury. Thus, the court will first discuss evidence of future volume of subject imports should the antidumping and countervailing duty orders be revoked.

I.       Evidence of Likely Volume

In both its cumulation determination and its injury determination, the ITC is required to examine the evidence of likely future volume of subject imports should the countervailing duty and antidumping duty orders be revoked.[10] Although the standards for

_____

[10]       As noted in footnote 3, the Commissioners in the original sunset review of these antidumping and countervailing duty orders were evenly divided in a three-to-three vote. In the view of the three dissenting Commissioners, the Commission's volume findings were not supported by substantial evidence. This too is the holding of the court. Set forth below are the views of the dissenting Commissioners with respect to the finding of volume as it relates to injury and, in the case of Commissioner Bragg, as it relates to both injury and cumulation.

Dissenting Views of Commissioner Okun and Commissioner Hillman:

During the period examined in the Commission's original investigations, the volume of subject imports from Italy increased from [[      ]] short tons ($[[          ]]) in 1990 to [[      ]] short tons ($[[          ]]) in 1993, increasing as a share of the U.S. market from [[    ]] percent to [[    ]] percent by quantity and from [[    ]] percent to [[    ]] percent by value. The volume of subject imports from Japan increased from [[      ]] short tons ($[[          ]]) in 1990 to [[      ]] short tons ($[[          ]] in 1993, increasing as a share of the U.S. market from [[    ]] percent to [[    ]] percent by quantity and from [[    ]] percent to [[    ]] percent by value. The Commission majority found the individual volumes to be significant.

Since reaching their peak in 1993, subject imports from Italy and Japan dropped off substantially and have been at very low levels since 1995. Although the reduction in volume appears to be in large part due to the imposition of the antidumping and countervailing duty orders in 1994, we do not find that the likely volume of subject imports would be significant if the orders were revoked.

First, neither the Italian nor Japanese producers have significant excess capacity that could be used to increase shipments to the U.S. market. Despite several increases in its capacity, Italian manufacturer AST reported high capacity utilization rates between 1997 and 1999, ranging between [[    ]] and [[    ]] percent. AST reported capacity utilization of [[    ]] percent for January-September 2000. AST reported that, as of December 2000, it was not accepting any new orders for delivery through May 2001. Japanese capacity has remained relatively steady between 1993 and 1999 at a level of approximately [[    ]] short tons annually. With the exception of one year (1998), the Japanese industry operated at very high capacity utilization during the period reviewed. Its capacity utilization was [[    ]] percent in interim 2000.

We do not find it likely that the subject producers would increase production capacity in the event of revocation. The subject producers have indicated that they have no plans to increase production and have detailed the significant time and expense required to add substantial new capacity.

Second, the subject producers do not maintain significant inventories of GOES that could be used to increase market share in the United States. AST reported no inventories of GOES in Italy. Inventories of GOES in Japan have been declining, and by September 2000 had fallen to [[    ]] short tons. There were [[    ]] inventories for GOES from Italy or from Japan reported by any U.S. importer.

Third, the record contains no indication that there are any barriers to the importation of the subject merchandise into countries other than the United States.

Fourth, we do not find that there is any significant potential for product-shifting by the subject producers in favor of increased production of GOES. The domestic industry argued that the subject producers could produce more GOES by switching some of their productive capacity from production of non-oriented electrical steel (NOES) to production of GOES. Although the two types of products, as well as other steel products, share a number of common production steps, there is a substantial production bottleneck presented by box annealing, which is specific to GOES production. Therefore, we do not find a likelihood of significant product shifting in favor of GOES production within a reasonably foreseeable time.

Thus, none of the factors enumerated in the statute support a finding of significantly increased subject import volumes upon revocation of the orders.

We also have examined the argument of the domestic industry that Italy and Japan would shift GOES exports from other markets to the United States if the orders are revoked. Both Italian and Japanese producers export a substantial portion of their production, thus presenting at least the possibility that they could shift GOES exports to the U.S. market. Producers in both countries have increased their exports to the other NAFTA countries since the orders were imposed. Although we view data on relative prices between different markets with caution, it

does appear that U.S. prices for GOES are generally higher than those in either Canada or Mexico. While a price differential may result in some shifting in favor of increased exports to the U.S. market, we do not believe any shift will be significant, for several reasons.

First, increased Italian and Japanese exports to Canada and Mexico have occurred at the same time as some U.S. transformer manufacturers shifted production to those countries, in part to be able to obtain subject GOES without being subject to the orders. A substantial portion of Japanese exports to Canada and Mexico are to large, multinational producers such as [[        ]]. We do not believe that the subject producers would jeopardize important transnational accounts simply to arbitrage price differentials between national markets.

Second, U.S. consumption of high-permeability GOES fell substantially between the original investigation and current review period, in part due to the movement of some transformer demand out of the United States and in part due to a shift in demand in favor of lower-cost conventional GOES. Thus, there is less demand for the main product type – high permeability GOES – that Japan (which has [[     ]] the larger industry of the two subject countries) exported to the United States during the original investigation and that Japan currently exports to the other NAFTA countries.

Third, as described in the section on Conditions of Competition, we expect robust U.S. demand for GOES in the foreseeable future. Thus, the U.S. market could absorb additional GOES imports without displacing existing domestic suppliers.

With respect to whether the industries in Italy or Japan would shift GOES from non-NAFTA markets to the United States, we note that world-wide demand for GOES is increasing. As global demand for electricity rises and governments seek to upgrade their electrical infrastructure, the world-wide demand picture for GOES in the foreseeable future is bright. Demand for electricity – and thus for products such as GOES that support electricity production and transmission – is expected to grow fastest in developing countries in Asia, such as China, and Central and South America. We do not find it likely that the subject producers would risk their access to other markets in order to sell significantly more GOES into the United States.

We note that AST, along with GOES producers in France and Germany, are all owned by ThyssenKrupp. Despite the fact that ThyssenKrupp could export GOES produced in Germany and France to the United States without being subject to the orders, it has not sought to increase its exports from those counties substantially. This fact buttresses the conclusion that it is not likely that a significant increase in imports from Italy would occur upon revocation.

Based on the foregoing, we do not find it likely that the volume of subject imports would increase substantially if the orders are revoked. We conclude that the likely volume of imports of the subject merchandise would not be significant if the subject orders are revoked, either in absolute terms or relative to production or consumption in the United States.

Dissenting View of Commissioner Bragg:

As set forth below, I find that revocation of the orders on subject imports from Italy and Japan would individually be likely to have no discernible adverse impact on the U.S. industry. In addition, I determine that in the aggregate subject imports from Italy and Japan would also be likely to have no discernible adverse impact, in the event of revocation. I therefore do not cumulate subject imports from Italy and Japan.

   1. Individual Country Analysis

     A. Italy

The record indicates that the sole Italian GOES producer is currently operating [[
     ]], [[   ]] percent in interim 2000, compared to [[   ]] percent in interim 1999. If this producer were to increase its capacity utilization to [[   ]] percent, the amount of excess capacity potentially available for shipment to the United States would be approximately [[   ]] short tons, which is equivalent to approximately [[   ]] percent of 1999 apparent U.S. consumption and [[   ]] percent of 1999 U.S. domestic production. While such a volume increase could, in certain instances, provide a sufficient basis for a finding that subject imports are likely to have a discernible adverse impact, the record in these reviews indicates that any such potential increase in the volume of Italian subject imports and any resulting potential discernible adverse impact on the domestic industry as a result of such an increase would likely be either limited or offset by several factors.

First, although the volume of subject imports from Italy may increase in the event of revocation (given that the Italian producer can now sell a higher-valued product in the U.S. market), any volume increase will be limited by robust GOES demand in the Italian home market.

Another important mitigating factor is the current condition of the domestic industry. The record indicates that in the most recent reporting period the domestic industry operated at [[
  ]] percent capacity utilization with an operating margin of [[  ]] percent. It is likely that this healthy condition will continue based on evidence indicating that GOES demand will remain strong in the United States. The likely continued growth in apparent U.S. consumption, and apparent current tightness of supply, can also be expected to limit any incentive the Italian subject producer may have to undersell in the U.S. market. Additionally, I note that GOES is generally made to order, and therefore less likely to impact prices throughout the market, in contrast to the impact of commodity products where small volumes of undersold merchandise are much more likely to impact prices broadly.

I therefore determine, based upon the foregoing, that revocation of the antidumping and countervailing duty orders on subject imports from Italy is likely to have no discernible adverse

_____

impact on the domestic industry.

       B.  Japan

      With respect to Japanese subject imports, on a volume basis, Japanese imports were minimal throughout the period reviewed and will likely remain so after revocation. Although the volume of subject imports from Japan may increase in the event of revocation (based upon the Japanese subject producers' high level of export-orientation), the potential increase is not likely to have a discernible adverse impact on the domestic industry because, as partially discussed above: (1) the condition of the domestic industry is healthy and is expected to be sustained in the reasonably foreseeable future; (2) U.S. and global demand is expected to continue to increase; and (3) Japanese producers are currently operating at [[        ]]. In addition, as discussed above, GOES is generally made to order, and therefore less likely to impact prices throughout the market than commodity products.

      I therefore determine, based upon the foregoing, that revocation of the antidumping duty order on subject imports from Japan is likely to have no discernible adverse impact on the domestic industry.

      2.  Aggregate Analysis

      Because I find that subject imports from the individual subject countries are likely to have no discernible adverse impact on the domestic industry in the event of revocation, I next consider whether imports from these countries, in the aggregate, are likely to have no discernible adverse impact.

      I determine, based upon my above findings, that even if there is likely to be some increase in the volume of subject imports from Italy and Japan, the volume of these imports, even in the aggregate, would still be likely to have no discernable adverse impact on the domestic industry. As noted above, any potential increase in the volume of subject imports, and any resulting potential discernible adverse impact on the domestic industry as a result of these imports, would likely be either limited or offset by the factors discussed above. I find that the above assessment regarding factors in support of my findings that subject imports are individually likely to have no discernible adverse impact on the domestic industry in the event of revocation are equally persuasive in the context of an aggregate analysis.

      Accordingly, I determine that, in the aggregate, subject imports from Italy and Japan are likely to have no discernible adverse impact on the domestic industry in the event of revocation.

II.  No Likely Continuation or Recurrence of Material Injury by Reason of Subject Imports from Italy or Japan

cumulation and injury are different, the two determinations share the evidence necessary to reach

a conclusion.


A.    High U.S. Prices

While not specifically instructed to do so, the Commission, on remand, expresses its

views as to how increased worldwide demand for GOES, including U.S. demand, would impact

GOES sales to the United States. The Commission's purpose in doing so is to answer the

argument that rising worldwide demand for GOES will cause the Japanese and Italian producers

to export their product to countries other than the United States. The ITC argues that, despite the

prospect of increasing worldwide demand for GOES, because the United States market

commands high prices for the product, foreign subject producers will have an incentive to export

to this country. *See* Second Remand Determination at 46. The claim that "GOES commands a

higher price in the U.S. market than in other markets" has been examined by this court and found

to be justified.[11] According to the ITC, these higher prices will inevitably attract foreign imports.

---

Since I find that subject imports from Italy and Japan are likely to have no discernible adverse impact on the domestic industry, either individually or in the aggregate, it follows that revocation of the orders at issue would also not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

Accordingly, and based upon all of the foregoing, I determine that revocation of the antidumping and countervailing duty orders on grain-oriented silicon electrical steel from Italy and Japan would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

Sunset Review at 22–25, 30–32 (footnotes omitted).

[11]    The conclusion that GOES commands a higher price in the U.S. market compared to other markets was established in *Nippon IV*, in which the court held that affidavits and evidence submitted by Plaintiffs for both Japan and Italy supported the conclusion that GOES

*See* Second Remand Determination at 46–47.  With this finding in mind, the court turns to the

Commission's country-specific arguments.


B.      Japan

On remand, the ITC was instructed to examine evidence relating to the Japanese

producers with respect to (a) interim 2000 capacity utilization data, (b) [[

]] that would direct Japanese GOES away from the U.S. market, and (c) the

inability of Japanese producers to increase production capacity.  *See Nippon IV*, 27 CIT at __,

305 F. Supp. 2d at 1366.


In its remand results, the ITC makes no claim that Japanese interim 2000 capacity

utilization data demonstrates a great deal of existing unused production capacity, or indeed that

there exists a likely prospect that the Japanese producers will expand production capacity.[12]

Rather, the ITC relies on its finding that domestic economic conditions in Japan, and increased

production in China and India, will free up Japanese capacity for export to the United States.  *See*

---

prices in the U.S. were higher than GOES prices in third country markets.  *See generally Nippon
IV*, 27 CIT __, 301 F. Supp. 2d 1355.  "With respect to Japan, th[e] evidence [provided]
indicate[d] that the purchase price for Japanese GOES was lower than comparable products sold
in third country markets.  With respect to Italy, the evidence support[ed] a finding that Italian
GOES was purchased at a lower price in third country markets than in the U.S. market."  *Id*. at
__, 301 F. Supp. 2d at 1376–77 (internal citation omitted).

[12]      Capacity utilization rates declined for Japanese producers from [[      ]] percent in
1997 to [[      ]] percent in 1998, but rose to [[      ]] percent in 1999.  Invs. Nos. 701-TA-355
and 731-TA-659-660 (Review): Grain-Oriented Electrical Steel from Italy and Japan Staff
Report, tbl. IV-6.  The ITC noted the high capacity utilization rates in interim 2000, [[      ]]
percent.  *See id.*

Second Remand Determination at 43; *see also id*. at 20 ( The ITC believes "[that the present] substantial production capacity in Japan [alone] . . . could be directed to the U.S. market within the reasonably foreseeable future if the order[s] were revoked.").

First, the ITC argues that Japanese domestic consumption will likely fluctuate as it has in the past, i.e., "Japanese subject producers' home market contracted throughout the period of review from . . . 1997 to . . . 1999 and . . . . Japanese home market shipments were lower in interim 2000 than in interim 1999." *Id*. at 43. According to the ITC, these fluctuations will have the effect of making subject merchandise that otherwise would be absorbed domestically available for export. In support of its conclusion that domestic consumption will likely fluctuate as it has in the past, the ITC presents the following evidence: the Japanese home market contracted throughout the period of review from [[     ]] percent [of Japanese producers' total shipments] in 1997 to [[     ]] percent in 1999 . . . . This trend will likely continue as Japanese home market shipments were lower in interim 2000 than in interim 1999." Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review): Grain-Oriented Electrical Steel from Italy and Japan Staff Report ("Staff Report"), tbl. IV-6.

Second, the ITC claims that news articles and other evidence cited in "[t]he record indicates that Japanese subject producers will be facing new and stiff competition in . . . China and India," and "[such competition] will likely displace Japanese exports of GOES in both these markets and cause [Japanese] subject producers to seek out other markets, such as the United States." *Id*. at 43–44.

Next, the ITC was instructed to examine whether the existence of [[

]] would direct Japanese GOES away from the U.S. market. *Nippon IV*, 27 CIT at __, 301 F.

Supp. 2d at 1366. This instruction was prompted by ITC staff observations that the existence of

such [[        ]] indicated that exports "may not be readily available in the short run to increase

GOES shipments to the United States in response to an increase in GOES demand." *Id.* at __,

301 F. Supp. 2d at 1365 (internal quotation omitted). On remand, the ITC states that, while this

statement shows that the Japanese subject producers may not be able to increase exports to the

United States over the short term, it does not mean that they will be unable to increase these

exports in the reasonably foreseeable future. Second Remand Determination at 19 (quoting the

Statement of Administrative Action, accompanying H.R. REP. NO. 103-826(I), at 887, *reprinted*

*in* 1994 U.S.C.C.A.N. 4040, 4212 ("SAA")[13] that a "'reasonably foreseeable time' [specified in

19 U.S.C. § 1675a(a)(5)] normally will exceed the 'imminent' timeframe applicable in a threat of

injury analysis."). In addition, the Commission argues that [[                ]] "will likely have

only a limited impact on Japanese subject producers' ability to redirect their exports to the United

States if the orders are revoked" because [[

]]. *Id.* Therefore, according to the ITC, these [[                ]] will not prevent

Japanese subject producers from increasing exports to the United States during the time period

prescribed by the statute.

---

[13]     The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

With respect to the court's inquiry regarding the Japanese producers' inability to increase production capacity, the ITC's sole response is that "[the ITC] do[es] not place great weight on this fact given the already substantial production capacity in Japan that could be directed to the U.S. market within the reasonably foreseeable future if the orders were revoked." *Id*. at 20. Therefore, the ITC claims that, although there is no evidence that Japanese producers have any unused production capacity or will increase production capacity, enough product could be redirected from existing capacity to provide sufficient exports to the United States for purposes of cumulation and material injury if the orders were revoked. *See id*. at 20–21. The ITC claims that this available capacity will be attracted by higher U.S. prices.

C.      Italy

As for Italy, the court instructed the ITC to reconsider the Commission's likely volume finding by taking into account that the Italian subject producer's capacity utilization rate during the most recent period remained high, which "'suggests that there is *little ability* of AST [the Italian subject producer] to increase exports to the United States in response to an increase in demand' . . . . [and that] the Italian producer would not likely increase its GOES production capacity due to the high costs and length of time required to do so." *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1365–66  (emphasis in original) (internal citation omitted).

In response, the ITC states that, while it is true that the record shows AST to have the

high capacity utilization rate[14] of [[    ]] percent for interim 2000, there still remains a [[    ]]

percent unused capacity which translates to [[    ]] short tons of unused capacity for that period.

*See* Second Remand Determination at 11 (citing Staff Report, tbl. IV-2).  For the ITC, this

unused capacity, while small, "could be used to produce at [the] very least a *discernible* volume,

that could be directed to the United States following revocation of the orders."  *Id*.  Thus,

according to the ITC, unlike Japan, Italy has some existing unused capacity.  In addition, the ITC

asserts that "at least [[   ]] percent of Italian capacity . . . remains uncommitted for 2001 . . . ."

*Id*. at 11, 42.  Such an amount of uncommitted capacity "represents a significant amount of

Italian production capacity that could be directed to the U.S. market following revocation of the

orders . . . ."  *Id*.  As with its determination with respect to Japan, here the ITC does "not place

great weight" on the lack of plans by AST to expand production capacity because its "already

substantial and uncommitted capacity could be directed to the U.S. market."  *Id*. at 12.

Therefore, according to the ITC, the Italian subject producer's interim 2000 capacity utilization

rate indicates some unused capacity and some uncommitted capacity.  For the ITC, this capacity,

when combined with a desire to take advantage of higher U.S. prices, indicates the volume of

exports to the United States is likely to increase if the orders are revoked.

----

[14]    The capacity utilization data prior to interim 2000 shows "the Italian subject
producer's capacity utilization rates declined from [[    ]] percent in 1997 to [[    ]] percent in
1999.  In 1999, the Italian subject producer had [[    ]] short tons of unused capacity, which
was equivalent to [[   ]] percent of U.S. apparent consumption and [[   ]] percent of U.S.
production for the same year."  Second Remand Determination at 10.

D.      Plaintiffs' Arguments with Respect to Japan and Italy

For their part, Plaintiffs argue that the evidence provided by the ITC does not justify the

conclusions in the Second Remand Determination.  First, Plaintiffs claim that the ITC has not

provided any evidence of existing unused production capacity for either Japan or Italy that could

lead to the conclusion that the subject producers would have the "appreciable unused capacity . . .

to produce significant amounts of GOES for the U.S. market."  Pls.' Comments on the Second

Remand Determination of the U.S. Int'l Trade Comm'n ("Pls.' Comments") at 16.  Second,

Plaintiffs reject the ITC's conclusion that Japanese subject producers would increase exports to

the United States due to "stiff competition" in China and India as unsupported by the record.  *Id*.

at 18–20.


II.     Cumulation

A.      Likely Volume – Discernible Adverse Impact

The court finds that, with respect to likely volume as it pertains to cumulation, the ITC

has provided sufficient evidence to support its finding.  Before making its "likelihood of

continuation or recurrence of material injury" determination in a sunset review, the ITC may

cumulatively assess the volume and effect of subject imports from different countries,[15] "if such

imports would be likely to compete with each other and with domestic like products in the

---

[15]      The aim of the cumulation provision is to address the "hammering effect" that
"'competition from unfairly traded imports from several countries simultaneously often has . . .
on the domestic industry.'"  *Neenah Foundry Co. v. United States*, 25 CIT 702, 708, 155 F.
Supp. 2d 766, 772 (2001) (quoting H.R. REP. NO. 100-40, part 1, 100th Cong., 1st Sess., at 130
(1987)).  The cumulation provision enables the ITC to conduct a "more realistic" material injury
analysis, "in terms of recognizing the actual effects of unfair import competition."  *Id*.

United States market." 19 U.S.C. § 1675a(a)(7); *see also Usinor Industeel, S.A. v. United States*, 26 CIT 467, 478 (2002) (not reported in the Federal Supplement). Cumulation is prohibited, however, where the ITC "determines that such imports are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7). That is, "[t]he Commission shall not cumulate imports *from any country* if those imports are likely to have no discernible adverse impact on the domestic industry." SAA at 887 (emphasis added); *see also Usinor Industeel, S.A. v. United States*, 26 CIT 1402, 1408 (2002) (noting "there is no statutory provision enumerating the factors to be considered in determining whether subject imports from a particular country are likely to have no discernible impact.").

It is important to note that the standard for "no discernible adverse impact" presents a relatively low threshold. *See Neenah Foundry Co. v. United States*, 25 CIT 702, 711, 155 F. Supp. 2d 766, 774 (2001) (stating "consideration of trends in re cumulation is not the equivalent of an injury analysis thereof . . . . [C]umulation of imports from the countries with relatively-small likely volume and price impact would not only be appropriate, a refusal to do so without some additional justification could constitute an abuse of discretion."); *see also Usinor Industeel, S.A. v. United States*, 27 CIT __, __, slip op. 03-118 at 6–7 (Sept. 8, 2003) (not reported in the Federal Supplement) (holding that the ITC did not have to show a significant volume of imported cut-to-length carbon steel from Belgium in order to cumulate the imports with other steel from sixteen other countries).

Here, the ITC has met the required threshold by identifying evidence in the record that

supports the conclusion that, should the antidumping and countervailing duty orders be revoked, it is likely that both the Japanese and Italian producers will export sufficient GOES to the U.S. to have a discernible adverse impact on the domestic industry. With respect to Japan, the ITC has shown that (a) [[                    ]] are not so restrictive as to prevent Japanese subject producers from directing increased exports to the United States in the reasonably foreseeable future, and (b) higher prices in the U.S. market will attract at least some Japanese subject imports. As for Italy, the ITC has shown that (a) despite a high capacity utilization rate of [[      ]] percent, the remaining [[    ]] percent translates to [[      ]] short tons of unused capacity that could be directed to the U.S.; and (b) at least some of this production capacity will be drawn to the U.S. by higher prices. *See* Second Remand Determination at 11. Thus, based on the evidence provided, the court finds that the ITC has complied with the remand instructions in *Nippon IV* regarding volume as they relate to cumulation, and has demonstrated that the volume of GOES from both Japan and Italy available for export to the United States would be sufficient to satisfy the discernible impact standard.

      B.      Reasonable Overlap of Competition Between Imports from Japan and Imports from Italy

The court now turns to the ITC's finding that the subject imports "would be likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7). Here, the ITC has found that a reasonable overlap in competition among the subject imports, and between subject imports and the domestic like product, would be likely to exist if the orders under review were revoked. *See Wieland Werke, AG v. United States*, 13

CIT 561, 563, 718 F. Supp. 50, 52 (1989) ("To invoke the cumulation statute, the imports to be cumulated must compete with one another and with the domestic like products they allegedly injure."); *Indorama Chems. (Thail.) v. United States Int'l Trade Comm'n*, 26 CIT 1059, 1068 (2002) (not reported in the Federal Supplement). In making a reasonable overlap of competition finding, the ITC has generally considered four factors: (1) the degree of fungibility between imports from different countries and between those imports and the domestic like product, (2) the presence of sales or offers to sell imports from different countries and the domestic like product in the same geographical markets, (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product, and (4) simultaneous presence in the market. *See* Sunset Review at 8 n.34. "These factors are neither exclusive nor determinative." *Indorama Chems. (Thail.)*, 26 CIT at 1068. As the decision to cumulatively assess the volume and effect of imports from different countries is made prospectively in the context of a sunset review determination, the ITC also considers "other significant conditions of competition that are likely to prevail if the orders under review are revoked." Sunset Review at 8; *see also Usinor Industeel*, 26 CIT at 1408.

In *Nippon IV*, the court did not affirm the ITC's findings with respect to fungibility and similar channels of distribution; therefore, these two findings were remanded to the ITC. As to fungibility, the court found that "it [was] undisputed that the Japanese and Italian subject producers 'can and do produce a broad range of GOES products . . . .'" *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1369 (internal quotation omitted). The court also found, however, that the ITC did not clearly support its conclusion that "Japanese and Italian producers would sell the

same or similar product to the United States." *Id*. In particular, the court directed the ITC to take into consideration that Japan exports primarily high-permeability GOES, while Italy exports primarily conventional GOES.

### 1.     Fungibility

On remand, the ITC was instructed to examine: (1) evidence relating to whether the Japanese producers would likely export conventional GOES to the U.S. such that it would compete with Italian conventional GOES, and (2) whether it is likely that the Japanese producers' patterns of sale will change so that there will be an increase in exports of conventional GOES to the United States. *Id*. at __, 301 F. Supp. 2d at 1377.

The ITC responds to the court's instructions by claiming that, although Japanese producers have historically shipped only high-permeability GOES to the United States, they would ship conventional GOES to the United States if the orders were revoked because (1) Japanese subject producers would likely change their product mix to take advantage of the high prices in the U.S., and (2) the Japanese producers have the ability to export conventional GOES, as is evidenced by the fact that in 2000, [[          ]] percent of Japanese GOES exports to Canada and Mexico were conventional GOES. *See* Def.'s Resp. to Pls.' Comments on the Second Remand Determination ("Def.'s Resp.") at 4–6; Second Remand Determination at 26 (citing to Japanese Respondents' Posthearing Br. at Appendix B). Therefore, the ITC again concludes that Japanese subject producers will make shipments of conventional GOES to the United States if the orders are revoked. *See id.*

With respect to Italy, the court similarly instructed the ITC to examine evidence as to (1) whether it is likely that the Italian subject producer will sell high-permeability GOES to the U.S. such that it would compete with Japanese high-permeability GOES, and (2) whether it is likely that the Italian subject producer's patterns of sale will change so that it will export high-permeability GOES to the United States. *See Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1377.

Here, the ITC argues that although the Italian producer, AST, has previously shipped only conventional GOES to the United States, the record shows an increase of [[    ]] percent in its high-permeability GOES production, and a significant change AST's product mix to focus on producing high-permeability GOES. *See* Def.'s Resp. at 9. Thus, the ITC concludes that, with such an increase, AST is likely to compete with the high-permeability GOES exported by Japanese producers. *See id*. The ITC also claims that Plaintiffs' citation to the absence of Italian high-permeability GOES shipments to the United States is not reliable evidence showing that AST does not have an intent or the ability to export high-permeability GOES to the U.S. *See* Def.'s Resp. at 9. According to the ITC, at the time this record was compiled, the Italian subject producer could not export to the U.S. because it was first restrained by certain [[ ]], and then by the antidumping and countervailing duty orders themselves. *See id*. The ITC, however, claims that the Italian subject producer is no longer restrained by [[          ]] and the orders will not be in place if the court directs their revocation. *See id*. Therefore, the Commission finds that, as the Italian subject producer has evidenced an intent "to concentrate on the production of high-permeability GOES and . . . has [the] incentive to ship to the higher-priced U.S. market," it will likely ship high-permeable GOES to the United States if the orders are

revoked. *Id*. at 9–10.

The court finds that the ITC has provided sufficient evidence to demonstrate that it is likely that (1) Japanese producers will increase exports of conventional GOES to the United States to compete directly with Italian conventional GOES, and (2) the Italian producer will shift its product mix to produce high-permeability GOES to compete directly with Japanese high-permeability GOES in the United States.

First, the ITC has shown that GOES commands a higher price in the U.S. Next, the ITC has also demonstrated that the Japanese producers have the present ability to produce conventional GOES for U.S. consumption by showing that Japanese producers have shipped conventional GOES to Canada and Mexico. Thus, it is likely that at least some Japanese conventional GOES will be exported to the U.S. market. With respect to Italy, the ITC demonstrated that the Italian subject producer has increased its high-permeability GOES production. The ITC also demonstrated that the Italian subject producer's lack of previous exports of high-permeability GOES to the U.S. was due to restrictive [[                    ]] and the subject orders themselves. Now that the [[              ]] are no longer in place, the Italian subject producer is likely to make at least some high-permeability GOES shipments to the U.S. if the orders are revoked. Hence, by showing such evidence, the ITC has supported its finding with substantial evidence that Japanese and Italian exports will likely compete directly

with each other should the orders be revoked.[16]


      2.     Channels of Distribution

On remand, the court instructed the ITC to revisit its finding that the Japanese and Italian

producers of GOES will change their patterns of sale, such that "common or similar channels of

distribution" for imports from Japan and Italy would exist. *See Nippon IV*, 27 CIT at __, 301 F.

---

[16] In addition to questions relating to direct competition between the imported products, the court remanded other matters dealing with fungibility. Because the court finds that the ITC has supported with substantial evidence its finding relating to direct competition sufficient to support a fungibility finding, these are matters of less importance. The court instructed the ITC on remand to take into account the following evidence: (a) that the type of conventional GOES produced by the Japanese producers for export to third country markets is actually thicker than the conventional GOES favored by U.S. purchasers, and (b) that the Japanese producers intend only to "sell small quantities of high-permeability products, particularly domain refined, that are not available from the U.S. industry." *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1371.

The ITC responds with evidence demonstrating that most U.S. production is of the thicker gauge. The ITC evidence shows that some Japanese shipments to the U.S. are of the same thickness as is generally used in the U.S. which demonstrates that Japanese producers can "satisfy U.S. gauge demand." Second Remand Determination at 28–29. Based on this evidence, the court finds that the Commission has supported with substantial evidence its finding that the Japanese producers have the ability to export GOES of the proper gauge to meet U.S. purchasers' demands.

As for the court's next inquiry, the ITC contends that, despite their claims to the contrary, the Japanese producers do not intend to sell only a small amount of high-permeability GOES in the United States of a type that is not offered by domestic producers. *Id*. at 30. The ITC argues that a showing that the U.S. market shows has an increasing demand for conventional GOES is no indication that high-permeability GOES is not also in demand. *See id*. at 30–31. According to the ITC, "the record shows that the use of high-permeability GOES has been persistent in the U.S. market and purchasers of GOES indicated that they expect demand for high-permeability GOES to increase." *Id*. at 31. The court finds that the ITC has demonstrated with substantial evidence that there remains a market for high-permeability GOES in the United States that will attract at least some Japanese production.

Supp. 2d at 1372 (quoting *Wieland Werke*, 13 CIT at 563, 718 F. Supp. at 52). The court

instructed the ITC to support its explanations with substantial evidence that the Japanese and

Italian producers will both likely sell to end users or laminators/slitters. *Id*. at __, 301 F. Supp.

2d at 1372–73.


In the Second Remand Determination, the ITC advances the theory that due to a change

in U.S. GOES purchasers' needs, Japanese and Italian subject producers will share similar

channels of distribution should the orders be revoked. The ITC explains that, during the original

period of investigation ("POI"), "Japanese GOES was sold directly to transformer manufacturers,

whereas Italian GOES was sold to stamp/laminators." Second Remand Determination at 32.

Since then, however, transformer manufacturers' demand has changed to include not only high-

permeability GOES (originally sold only by Japan) but also conventional GOES (originally sold

only by Italy). *Id*. In support of this conclusion, the ITC claims that:

> The increasing utilization of conventional GOES, including —6
> grade, by transformer manufacturers makes it likely that Italian
> GOES will be sold to transformer producers as well as
> stampers/laminators. Moreover, evidence [showing] that the
> Italian producer will likely change its product mix and sell high-
> permeability GOES to the U.S. market means that subject imports
> from Italy will likely be sold directly to the end user in the same
> channel of distribution as subject imports from Japan, because the
> transformer manufactures are the sole purchasers of high-
> permeability GOES.

*Id*. at 32–33. In addition, as previously noted, it is likely that if the orders are revoked, the

Japanese producers will export some conventional GOES to the U.S. and the Italian producer

will export some high-permeability GOES to the U.S., thus creating direct competition in the

same product lines. *See id*. Therefore, the Commission concludes that, because Italy and Japan will now likely supply the same products directly to the same end users, they likely will also be sharing the same channels of distribution. *Id*.

The court finds that the ITC has provided substantial evidence to show that an overlap of competition between Japanese and Italian GOES imports will likely result in the subject producers sharing the same channels of distribution. The ITC has shown that, since the POI, transformer manufacturers in the U.S. now demand both high-permeability GOES and conventional GOES. This change will likely cause transformer manufacturers to purchase from the Italian producer as well as the Japanese producers through the same distribution channels. In addition, the ITC has previously demonstrated that the subject producers will change their product mix to compete directly. Because the producers are likely to share the same product mix, it is reasonable to assume that they are also likely to share the same channels of distribution. Thus, the court affirms the ITC's finding with respect to channels of distribution.

Having affirmed the ITC's findings regarding fungibility and channels of distribution, the court also affirms its determination as to reasonable overlap of competition.

III.    Likelihood of Continuation or Recurrence of Material Injury

The ITC is instructed by statute to consider "the likely volume, price effect, and impact of imports on the subject merchandise on the industry if the order is revoked . . . ." 19 U.S.C. § 1675(a)(1).

A. ___Likely Volume

As with a cumulation determination, volume is an important factor in assessing injury.

Title 19 U.S.C. § 1675a(a)(2) governs this finding.

> In evaluating the likely volume of imports of the subject
> merchandise if the order is revoked . . . the Commission shall
> consider whether the likely volume of imports of the subject
> merchandise would be significant if the order is revoked . . . either
> in absolute terms or relative to production or consumption in the
> United States. In doing so, the Commission shall consider all
> relevant economic factors, including—
>
> (A) any likely increase in production capacity or existing unused
> production capacity in the exporting country,
>
> (B) existing inventories of the subject merchandise, or likely
> increases in inventories,
>
> (c) the existence of barriers to the importation of such merchandise
> into countries other than the United States, and
>
> (D) the potential for product-shifting if production facilities in the
> foreign country, which can be used to produce the subject
> merchandise, are currently being used to produce other products.

19 U.S.C. § 1675a(a)(2)(A)–(D).

While the evidence of volume specified by the ITC is the same for its cumulation finding

and its material injury finding, the standard with respect to finding material injury is higher. This

is because a "significant" volume is more consequential than a "discernible" volume. Thus, in

accordance with the statute, in order to find sufficient volume for there to be injury, the ITC must

identify substantial evidence from the record demonstrating that, should the orders be revoked, it

is likely that the volume of the subject imports entering the U.S. market will be significant. *See*

19 U.S.C. § 1675a(a)(2).

This Court has previously found that, in determining whether there is sufficient volume to constitute injury, the ITC must employ the word "likely" so that "likely means probable." *Usinor Industeel*, 26 CIT at 474 (stating that the common meaning of likely is probable); *Nippon Steel Corp. v. United States*, 26 CIT 1416, 1419 (2002) (not reported in the Federal Supplement) (finding that "likely means probable"); *see also NMB Singapore v. United States*, 27 CIT __, __, 288 F. Supp. 2d 1306, 1352 (2003); *Comm. for Fair Coke Trade v. United States*, 28 CIT __, __, slip op. 04-68 at 37 (June 10, 2004) (not reported in the Federal Supplement).

In addition, the word "significant" has been defined by this Court as "having or likely to have influence or effect[;] deserving to be considered[;] important, weighty, notable." *Gerald Metals, Inc. v. United States*, 22 CIT 1009, 1013, 27 F. Supp. 2d 1351, 1355 (1998) (quoting Webster's Third New International Dictionary, 2116 (1993)) (holding that substantial evidence supported the Commission's determination that the volume of less than fair value imports of magnesium from Ukraine was not significant); *see also United States v. Walker*, 202 F.3d 181, 185 (3d Cir. 2000) (citing Webster's Third New Int'l. Dictionary Unabridged 2116 (1966) as "deserving to be considered: important, weighty, notable.").

In reaching its determination, the ITC must consider whether the likely volume would be significant in absolute terms, or relative to production or consumption in the United States. *See* 19 U.S.C. § 1677(7)(C)(i); *see also USX Corp. v. United States*, 12 CIT 844, 848, 698 F. Supp.

234, 238 (1988) ("In focusing its attention on the relative share of the domestic market held by Argentine imports, [the] ITC fulfilled its statutory duty to analyze the volume of imports in either an absolute or relative sense depending upon what is appropriate under the circumstances.").

The ITC does not claim that any of the four economic factors set forth in 19 U.S.C. § 1675a(a)(2) exist with respect to Japan. In particular, the ITC does not maintain that the Japanese producers have any existing unused capacity to produce GOES. Rather, the ITC relies on the notion that Japanese subject producers have substantial existing production capacity that would be redirected to the United States, if the orders were lifted. The ITC's finding rests on evidence pertaining to economic conditions in Japan, and projected increased competition from GOES production in China and India. The essence of this argument is that these projected circumstances, when combined with higher U.S. prices, will provide the ability and the incentive for Japan to redirect significant exports to the United States.

With respect to domestic Japanese economic conditions, the ITC states that "domestic consumption will likely fluctuate as it has in the past." First Remand Determination at 11 n.56; *see also* Second Remand Determination at 43. As to evidence of increased competition from domestic production with China, the ITC cites news articles and other evidence found in the Petitioner's post-hearing brief indicating that China will increase domestic production of electrical steel. *See* Second Remand Determination at 43. Regarding India, the Commission

advances a single news article from the same source.[17]  *Id*.

The court finds that the ITC has not demonstrated by substantial evidence that it is probable that the volume of the Japanese imports would be significant if the orders be revoked. Even taking into account the ITC's claims of stiff domestic competition in China and India, the heart of the Commission's finding remains that it is probable that, if the orders are revoked, the Japanese producers would abandon their current customers and shift a significant amount of GOES to the United States.  The ITC has simply not demonstrated this probability.  At most, the ITC has shown this result to be possible.

First, the ITC has not demonstrated that decreased demand in the Japanese home market will likely increase Japanese exports to the United States.  In asserting this cause and effect relationship, the Commission first states that fluctuations in Japanese domestic demand have occurred in the past, and then makes the reasonable assumption that domestic consumption will fluctuate in the future.  The ITC has produced no probative evidence, however, tending to show that such fluctuations will result in a significant amount of GOES being exported to the United

---

[17]     The ITC also discussed whether [[
]] might direct subject imports away from the United States. *See* Second Remand Determination at 44.  Here, the ITC's primary claim is that these [[               ]] could restrict exports to the U.S. over the "short-run" but not during the "reasonably foreseeable time" specified by 19 U.S.C. § 1675a(a)(5).  In addition, the ITC claims that these [[        ]] are subject to [[             ]].  Thus, for the ITC, these [[              ]] would not prevent redirection of Japanese production to the United States.  Based on the evidence in the record, the court finds that the ITC has demonstrated with substantial evidence that these [[           ]] would not hinder the export of GOES to the U.S. in the foreseeable future.

States. In fact, an examination of the record reveals evidence that fairly detracts from this finding. For example, in 1999 when the orders were in effect, the Japanese producers' shipments within its home market decreased 5.5 percent from the previous year. Not surprisingly, exports to countries other than the U.S. increased by the same percentage. *See* Staff Report, tbl. IV-6. Thus, it is clear that when the U.S. market was effectively closed to the Japanese producers, they were able to dispose of their available capacity by exporting elsewhere. More importantly, an examination of the Japanese producers' behavior before the orders went into effect does not support the Commission's view. In 1991, the Japanese producers shipped [[    ]] percent of production to the home market. *Id*. In 1992, that figure was [[    ]] percent—a decrease of [[ ]] percent. *Id*. In 1991, the percentage of production exported to the U.S. was [[    ]] percent, while in 1992 it dropped to [[    ]] percent. *Id*. In absolute terms, this means that in 1991, [[ ]] short tons were exported to the U.S., while [[    ]] short tons were similarly exported in 1992. *Id*. This occurred while, in absolute terms, home market shipments decreased from [[ ]] short tons to [[    ]] short tons. *Id*. Thus, there appears to be no historic correlation between Japanese home market shipments and exports to the U.S. Rather, the evidence shows that in a year where there were no legal barriers to entry into the U.S., a decrease in home market sales resulted in increased exports elsewhere, but not to the United States. That is, a decrease in Japanese home market sales resulted in exports to other countries, which increased from [[    ]] percent to [[    ]] percent of production from 1991 to 1992. In absolute terms, this is an increase from [[    ]] short tons to [[    ]] short tons over that same period. *See id*.

In making its volume finding, the ITC relies heavily on its conclusion that stiff

competition from domestic GOES production in China and India will decrease exports to those countries, thus making product available for export to the U.S. In order to answer the argument that there is little reason to suppose that a substantial amount of available capacity resulting from fluctuations in Japanese home market consumption will be directed to the U.S., the ITC asserts that "[t]he record indicates that Japanese subject producers will be facing new and stiff competition in two of their major export markets, China and India, with the development of electrical steel industries in both those countries." Second Remand Determination at 43. The ITC directs the court's attention to Petitioners' post-hearing brief for evidence substantiating this conclusion. *See* Pets.' Post-hearing Br. at 20–23.

As to China, the post-hearing brief cites news articles and other sources that discuss expansion in the Chinese electrical steel industry. It is apparent from examining these sources that China has a policy of expanding its electrical steel output, and that it is acting to implement this policy. Two things, however, are not apparent: (1) the extent to which an expanding Chinese economy will absorb this new domestic capacity, and (2) whether any of this new electrical steel output consists of GOES. Thus, while the Commission asserts that domestic Japanese market conditions will put increased pressure on the Japanese producers to export, it makes no effort to assess Chinese market conditions. As a result, there is no indication as to how much of China's new production will be absorbed domestically. In addition, there is no indication that the increase in electrical steel production in China will result in the production of GOES. It is clear that the category "electrical steel" encompasses more products than varieties of GOES. *See, e.g.,* www.alleghenyludlum.com (last visited June 1, 2005) (indicating that the category "electrical

steel" includes "non-oriented silicon-iron alloys" (i.e., relay sheets)). As such, while it may be reasonable to infer that Japanese producers will be facing some competition from domestic Chinese producers, there is little indication that such competition will be stiff with respect to GOES.

As to India, Petitioners' sole evidence of future stiff competition is a September 12, 2000, news article in *American Metal Market*. A review of this article reveals that Plaintiffs are precisely right in their characterization of it:

> With respect to India, the only evidence cited by the ITC is a brief discussion in an attachment to the Petitioners' post-hearing brief, which in turn cites to a news article discussing plans by ThyssenKrupp to purchase and expand operations of Raymad Ltd., India's lone electrical steel producer . . . . Nowhere does this article indicate that Raymad Ltd. currently manufactures *grain oriented silicon electrical steel* . . . . Nor does the article mention any plans to begin producing GOES.

Pls.' Comments at 18–19 (citing Christian Kohl, *Thyssen Krupp, Raymond join in cold-roll, electrical sheet jv.*, AMERICAN METAL MARKET, Sept. 12, 2000, at 6).

It is worth noting that while Petitioners claim in their post-hearing brief that the article states that the purchaser "intended to focus the increased production on higher-value electrical steel," Pets.' Post-hearing Br. at 20, the article in fact states that the purchaser merely intended to "increase the percentage of higher value electrical sheet." Christian Kohl, *Thyssen Krupp, Raymond join in cold-roll, electrical sheet jv.*, AMERICAN METAL MARKET, Sept. 12, 2000, at 6. As previously noted, "sheet" could mean non-oriented silicon-iron alloys or relay sheets. Thus, the ITC has not cited substantial evidence of foreseeable stiff competition from domestic Indian

producers.

With respect to Italy, the court finds that the ITC also has not demonstrated that future volume would be significant either in absolute or relative terms. In *Nippon IV*, the court directed the ITC to show how AST would have the ability to increase its exports to the United States. It is undisputed that the Italian subject producer's capacity utilization rate for 2000 is high at [[    ]] percent. *See* Second Remand Determination at 10. According to the ITC, were the Italian producer to increase production to 100 percent, then [[    ]] short tons of GOES would be available for export to the United States. *Id*. at 11. As pointed out by Commissioner Bragg, however, even if all of this amount were exported to the U.S. market, it would hardly be significant. According to Commissioner Bragg, 100 percent capacity utilization would result in an increase of

> [[    ]][18] short tons, which is equivalent to approximately [[
> ]] percent of 1999 apparent U.S. consumption . . . . While such a
> volume increase could, in certain instances, provide a sufficient
> basis for a finding that subject imports are likely to have a
> discernible adverse impact, the record in these reviews indicates
> that any such potential increase in the volume of Italian subject
> imports and any resulting potential discernible adverse impact on
> the domestic industry as a result of such an increase would likely
> be either limited or offset by several factors . . . . [such as] robust
> GOES demand in the Italian home market[,] . . . . current condition
> of the domestic industry . . . and the fact that GOES is generally
> made to order."

---

[18] Although Commissioner Bragg's calculation of the tonnage resulting from an increase to 100 percent capacity utilization differs from that of the ITC, the difference is not so great as to affect the conclusion. Indeed, since the Commissioner's calculation is the larger of the two, it makes her point in stronger terms.

Sunset Review at 30.

In addition to its arguments with respect to excess capacity, the ITC insists that uncommitted capacity will be a further source of significant Italian exports to the United States. According to the ITC, this uncommitted capacity amounts to 30 percent of interim 2000 production. In addition, the ITC claims that higher U.S. prices will attract a sufficient amount of this uncommitted capacity to result in significant exports to the United States. This finding with respect to uncommitted capacity is the same as that expressed by the ITC in its findings concerning Japan.

That the Commission's conclusions are not supported by substantial evidence is best demonstrated by the dissenting views of Commissioners Okun and Hillman:

> We also have examined the argument of the domestic industry that Italy and Japan would shift GOES exports from other markets to the United States if the orders are revoked. Both Italian and Japanese producers export a substantial portion of their production, thus presenting at least the possibility that they could shift GOES exports to the U.S. market. Producers in both countries have increased their exports to the other NAFTA countries since the orders were imposed. Although we view data on relative prices between different markets with caution, it does appear that U.S. prices for GOES are generally higher than those in either Canada or Mexico. While a price differential may result in some shifting in favor of increased exports to the U.S. market, we do not believe any shift will be significant, for several reasons.
>
> First, increased Italian and Japanese exports to Canada and Mexico have occurred at the same time as some U.S. transformer manufacturers shifted production to those countries, in part to be able to obtain subject GOES without being subject to the orders. A substantial portion of Japanese exports to Canada and Mexico are

to large, multinational producers such as [[      ]].  We do not believe that the subject producers would jeopardize important transnational accounts simply to arbitrage price differentials between national markets.

Second, U.S. consumption of high-permeability GOES fell substantially between the original investigation and the current review period, in part due to the movement of some transformer demand out of the United States and in part due to a shift in demand in favor of lower-cost conventional GOES.  Thus, there is less demand for the main product type – high permeability GOES – that Japan (which has [[      ]] the larger industry of the two subject countries) exported to the United States during the original investigation and that Japan currently exports to the other NAFTA countries.

Third, as described in the section on Conditions of Competition, we expect robust U.S. demand for GOES in the foreseeable future. Thus, the U.S. market could absorb additional GOES imports without displacing existing domestic suppliers.

With respect to whether the industries in Italy or Japan would shift GOES from non-NAFTA markets to the United States, we note that world-wide demand for GOES is increasing.  As global demand for electricity rises and governments seek to upgrade their electrical infrastructure, the world-wide demand picture for GOES in the foreseeable future is bright.  Demand for electricity – and thus for products such as GOES that support electricity production and transmission – is expected to grow fastest in developing countries in Asia, such as China, and Central and South America. We do not find it likely that the subject producers would risk their access to other markets in order to sell significantly more GOES into the United States.

We note that AST, along with GOES producers in France and Germany, are all owned by ThyssenKrupp.  Despite the fact that ThyssenKrupp could export GOES produced in Germany and France to the United States without being subject to the orders, it has not sought to increase its exports from those counties substantially.  This fact buttresses the conclusion that it is not likely that a significant increase in imports from Italy would occur upon revocation.

> Based on the foregoing, we do not find it likely that the volume of subject imports would increase substantially if the orders are revoked. We conclude that the likely volume of imports of the subject merchandise would not be significant if the subject orders are revoked, either in absolute terms or relative to production or consumption in the United States.

Sunset Review, Dissenting Views of Commissioner Okun and Hillman, at 23–25.

Finally, the ITC has not demonstrated that it is probable that the volume of the subject imports will likely be significant "either in absolute terms or relative to production or consumption in the United States." 19 U.S.C. § 1675a(a)(2). On remand, the Commission determined that "the likely volume of subject imports would be significant in terms of U.S. production and U.S. apparent consumption if the countervailing and antidumping duty orders were revoked." Second Remand Determination at 47. The remand determination gives no indication as to how the Commission arrived at this conclusion.

On remand, the ITC may either reopen the record and reexamine its findings with respect to both countries' likely volume as it relates to injury, or find that the likely volume on revocation of the orders would likely not be significant and complete its analysis accordingly. *See Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1382 (Fed. Cir. 2003).

          B.     Likely Price Effect

The next element of injury that the ITC was instructed to reexamine on remand was price effect. Title 19 U.S.C. § 1675a(a)(3) states:

> In evaluating the likely price effects of imports of the subject merchandise if the order is revoked . . ., the Commission shall consider whether—
>
> (A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and
>
> (B) imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products.

*Id*. According to the SAA, "in considering the likely price effects of imports in the event of revocation . . . the Commission may rely on circumstantial, as well as direct, evidence of the adverse effects of unfairly traded imports on domestic prices." SAA at 886. With respect to likely price effects, the ITC reiterated its finding that if the orders were revoked, significant volumes of subject imports likely "would be likely to lead to significant underselling by the subject imports of the domestic like product, as well as significant price depression or suppression, within a reasonably foreseeable time." First Remand Determination at 15; Sunset Review at 19.

In *Nippon IV*, the court did not sustain "the ITC's use of the average unit values of [temporary import under bond ("TIB")][19] entries as indicators of the 'aggressive low prices at which the unfairly traded imports likely would be sold in the U.S. market if the orders were revoked.'" *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1381. On remand, the court instructed

---

[19] Temporary Imports Under Bond entries are brought into the United States for subsequent export to Canada or Mexico.

the ITC to

> reexamine whether the use of [average unit value ("AUVs")] as an
> indicator of price underselling produced an accurate comparison of
> price differences.  In reaching its determination, the ITC shall
> explain the differences and similarities between the products
> imported temporarily for re-exportation to Canada or Mexico and
> those imported for consumption in the United States, and support
> such determination with record evidence.

*Id*. at __, 301 F. Supp. 2d at 1382.


On remand, the ITC concedes that "comparisons of AUVs for TIB entries and AUVs for imports for consumption may not allow direct price comparisons . . . ."  Second Remand Determination at 51; *see also Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1381.  Nevertheless, the ITC maintains that its likely price effect finding should be affirmed because, even though the record shows that Italian TIB entries were conventional GOES, while Japanese TIB entries were high-permeability GOES, "both conventional and high-permeability GOES [prices] for the same period [were lower than domestic prices]."  Second Remand Determination at 52.  Thus, the ITC contends that the TIB prices have some probative value for demonstrating underselling even when there is no direct "apples to apples" comparison.  *See id.*  In addition, the ITC emphasizes that the other price effect findings that the court affirmed in *Nippon IV* are independent of the consideration of TIB prices.  In other words, the ITC maintains that regardless of the value of the TIB analysis, the other factors[20] supporting a finding of likely significant adverse price effect all

---

[20]     The other factors supporting the ITC's finding of likely price effects that have already been affirmed by the court in *Nippon IV* are (1) substitutability, (2) the importance of price as a factor in purchasing decisions, (3) greater competition in the U.S. will result, and (4) heightened price competition.  *See Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1380–81.

remain unchanged. *See* Def.'s Response at 26. Therefore, the ITC urges the court to affirm the its likely price effect finding.

In *Nippon IV*, the court held that four of the five factors the ITC cited to support its likely significant adverse price effect finding were supported by substantial evidence. In addition, the court finds that the ITC's explanation in the First Remand Determination of AUVs as an indicator of price underselling is some proof of sales below domestic prices, if not proof of "aggressive low prices." First Remand Determination at 13 n.67. Therefore, the court affirms the ITC's finding of likely adverse price effects should the orders be lifted.

C. ___Likely Impact

The ITC is instructed by statute to consider the likely impact of imports of subject merchandise on the domestic industry if the orders are revoked. 19 U.S.C. § 1675a(a)(1). Pursuant to 19 U.S.C. § 1675a(a)(4), the ITC

> shall consider all relevant economic factors which are likely to
> have a bearing on the state of the industry in the United States,
> including, but not limited to—
>
> (A) likely declines in output, sales, market share, profits,
> productivity, return on investments, and utilization of capacity,
>
> (B) likely negative effects on cash flow, inventories, employment,
> wages, growth, ability to raise capital, and investment, and
>
> (c) likely negative effects on the existing development and
> production efforts of the industry, including efforts to develop a
> derivative or more advanced version of the domestic like product.
>
> The Commission shall evaluate all relevant economic factors

> described in this paragraph within the context of the business cycle
> and the conditions of competition that are distinctive to the
> affected industry.

*Id*. In accordance with 19 U.S.C. § 1675a(a)(1), the ITC is directed to consider the effect of the

subject orders, including whether improvement in the state of the domestic industry is linked to

the imposition of the orders, and the vulnerability of the domestic industry in the event the orders

are revoked. In the First Remand Determination, the ITC found that after imposition of the

orders, "the domestic industry's performance improved significantly." *Nippon IV*, 27 CIT at __,

301 F. Supp. 2d at 1383 (quoting First Remand Determination at 16–17). The ITC further

determined that "the domestic industry has returned to a relatively healthy state and is not

currently in a vulnerable condition as contemplated by [19 U.S.C. § 1675a(1)(c)]." *Id.*


In *Nippon IV*, the court remanded the ITC's findings on likely impact with instructions to

> explain how, if at all, any revisions to the ITC's likely volume and
> likely price effects determinations alter its impact finding[21] . . . .
> and identify specific record evidence supporting its findings with
> respect to production, sales, revenue levels, profitability, ability to
> raise capital, investments, and employment.

*Nippon IV*, 27 CIT at __, 301 F. Supp. 2d. at 1385. The key to this inquiry is for the ITC to

---

[21] The Commission was also instructed to "explain, in detail, the extent to which future imports factored into its no vulnerability findings." *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1385. In response, the Commission states "[w]hile the domestic industry will be negatively affected by likely changes in the volume of subject imports and subsequent price changes that will likely occur in the event of revocation, we find that the domestic industry is not currently in a weakened condition as contemplated by the vulnerability criterion of the statute . . . ." Second Remand Determination at 56. In other words, an assessment of future imports, absent the revocation of the orders, did not alter the Commission's no vulnerability finding.

demonstrate how it could justify arriving at its conclusion, while also finding that the domestic

industry is no longer in a "vulnerable state."[22]


The ITC responded to the court's instructions by repeating much of its argument

presented in *Nippon IV*. In addition, the Commission made some further observations. First, the

ITC insists that the very fact that the domestic industry has returned to health (i.e., is not

vulnerable) is evidence that revocation of the orders will result in injury: "In this matter, because

the orders have allowed the domestic industry to recover to a significant degree, their removal

will likely lead to a recurrence of material injury in view of the likely significant volumes of

subject imports having significant adverse price effects." Second Remand Determination at 55.

The ITC cites little record evidence for this conclusion, other than relying heavily on its volume

findings previously found wanting.


Second, the ITC claims that the domestic industry "has become more efficient, resulting

in domestic prices that were lower during the period of review than they were during the original

investigations." *Id*. at 56. Nonetheless, the ITC argues that domestic producers are confronted

with higher costs of goods sold[23] and higher [[      ]] prices, which mean that "the domestic

---

[22]       "The term 'vulnerable' relates to susceptibility to material injury by reason of dumped or subsidized imports." SAA at 885. The ITC claims that, in accordance with the SAA, it need not determine that there is no likelihood of recurring material injury simply because "the industry has recovered after the imposition of an order." *See* Second Remand Determination at 55 (citing SAA at 884).

[23]       It is worth noting that the Commission makes no attempt to explain the seeming contradiction between its findings that (1) that the domestic industry has become more efficient, resulting in lower domestic prices, and (2) that same industry has a higher cost of goods sold.

industry will have less ability to cut prices in order to compete with these low-priced imports. As a result, the domestic industry will likely be faced with a cost price squeeze *and will likely experience a rapid loss in profitability*." *Id*. (emphasis added). The ITC cites no record evidence for its conclusion that it is probable that the industry will "experience a rapid loss in profitability."

Next, the Commission cites its volume finding as evidence that, should the orders be revoked, "the volume and price effects of the cumulated subject imports would have a significant negative impact on the domestic industry and would likely cause the domestic industry to lose market share." *Id*. at 57. The court has found that these volume findings, as they relate to injury, are not supported by substantial evidence.

Finally, the ITC presents no evidence as to how the revocation of the subject orders would affect the statutory factors found in 19 U.S.C. § 1675a(a)(4) beyond citing its volume finding and its conclusion that a cost/price squeeze would result in a rapid loss in profitability should the orders be revoked. Nonetheless, the ITC, without further explanation,[24]

> find[s] it likely that the effect of revocation on domestic prices,
> production, and sales would be significant. The price and volume

---

[24]    As explained in *Nippon IV*, the ITC claimed in the First Remand Determination that it considered the effect revocation of the subject orders would have on the domestic industry in the context of the factors enumerated in 19 U.S.C. § 1675a(a)(4), i.e., production, sales, revenue levels, profitability, ability to raise capital, investments, and employment. *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1385 n.38. However, as the ITC did not cite any record evidence pertaining to these factors, the court instructed the ITC to do so in this Second Remand Determination.

> declines would likely have a significant adverse impact on the production, shipment, sales, and revenue levels of the domestic industry . . . . [hinder the industry's] profitability . . . and result in employment declines for domestic firms."

*Id*. at 58.

Thus, the ITC's impact determination relies on two findings: first, likely volume; and second, the ITC's conclusion that the higher cost of goods sold coupled with higher [[     ]] prices will lead to a cost/price squeeze as a result of which the domestic industry "will likely experience a rapid lost in profitability."

The court finds unsupported by substantial evidence the ITC's conclusion that, should the orders be revoked, the domestic industry will probably experience a rapid loss in profitability. Indeed, while the Commission cites some evidence of a possible cost/price squeeze and some evidence of the necessity to elevate capacity utilization rates, it directs the court to no evidence concerning a rapid loss in profitability. On remand, the Commission was instructed to "identify specific record evidence supporting its findings with respect to production, sales, revenue levels, profitability, ability to raise capital, investments, and employment." *Nippon IV*, 27 CIT at __, 301 F. Supp. 2d at 1385. In response, the ITC states: "We note that the Court requested that we provide record cites for our adverse impact findings. We have provided them to the extent possible. However, such record cites are limited due to the prospective nature of these reviews." Second Remand Determination at 59 n.220. It is of course true that here, the ITC is making a prediction about the future. Nonetheless, it must base its analysis on facts, not speculation.

Despite having found that the domestic industry is not "vulnerable," the Commission has determined that, upon revocation of the orders, the domestic industry would experience a significant adverse impact. It has not, however, produced substantial evidence to support this conclusion. Because the court finds neither the Commission's finding as to rapid loss in productivity nor its finding as to likely volume to be supported by substantial evidence, it does not affirm the ITC's conclusion with respect to adverse impact.

On remand, the ITC may either reopen the record in order to obtain substantial evidence to support its adverse impact conclusion or make a determination that subject imports will have no adverse impact should the orders be revoked, and complete its analysis accordingly.

CONCLUSION

For the foregoing reasons, the court remands this action to the International Trade Commission for further action in accordance with this opinion.

Remand results are due on September 13, 2005, comments are due on October 13, 2005, and replies to such comments are due on October 24, 2005.

                                                    /s/ Richard K. Eaton
                                                    Richard K. Eaton

Dated: June 15, 2005
       New York, New York