Slip Op. 06-69

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| NIPPON STEEL CORP., KAWASAKI STEEL CORP., JFE STEEL CORP., THYSSENKRUP ACCIAI SPECIALI TERNI S.p.A, and ACCIAI SPECIALI TERNI (USA), INC., | : | |
| Plaintiffs, | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| | : | Consol. Court. No. 01-00103 |
| UNITED STATES, | : | Public Version |
| Defendant, | : | |
| and | : | |
| ALLEGHENY LUDLUM CORP., AK STEEL CORP., BUTLER ARMCO INDEPENDENT UNION, ZANESVILLE ARMCO INDEPENDENT UNION, and UNITED STEEL WORKERS OF AMERICA, AFL-CIO/CLC, | : | |
| Deft.-Intervenors. | : | |

OPINION

[International Trade Commission's final determination pursuant to third remand affirmed]

Dated: May 9, 2006

*Gibson, Dunn & Crutcher, LLP* (*Gregory Christopher Gerdes* and *Joseph H. Price*), for plaintiffs Nippon Steel Corporation and JFE Steel Corporation.

*Hunton & Williams, LLP* (*Robert H. Huey*), for plaintiffs Kawasaki Steel Corporation and JFE Steel Corporation.

*Hogan & Hartzon, LLP* (*Lewis E. Leibowitz*), for plaintiffs ThyssenKrupp Acciai Speciali Terni S.p.A. and Acciai Speciali Terni (USA), Inc.

*James M. Lyons*, General Counsel, U.S. International Trade Commission (*Gracemary R. Roth-Roffy* and *Mark B. Rees*), for defendant.

*Collier, Shannon, Scott, PLLC* (*Kathleen W. Cannon*), for defendant-intervenors.


Eaton, Judge: This consolidated action[1] is before the court following remand to the United States International Trade Commission ("ITC" or the "Commission") of its affirmative injury determination contained in Grain-Oriented Silicon Electrical Steel From Italy and Japan, Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review) (Second Remand), USITC Pub. 3680 (Mar. 2004) ("Second Remand Determination").  *See Nippon Steel Corp. v. United States*, 29 CIT __, 391 F. Supp. 2d 1258 (2005) ("*Nippon V*").  Pursuant to remand, the ITC issued its third remand determination in Grain-Oriented Silicon Electrical Steel From Italy and Japan, Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review) (Third Remand) USITC Pub. 3798 (September 13, 2005) ("Third Remand Determination"), finding that revocation of the subject antidumping and countervailing duty orders would not likely lead to a continued or recurring material injury to the domestic industry within the foreseeable future.  Defendant-

---

[1]     This action includes court numbers 01-00104, and 01-00105.  *See* Order of 6/19/01.

intervenors, each participants in the domestic grain-oriented silicon electrical steel ("GOES") industry, challenge this negative determination.  Jurisdiction lies under 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I).  For the reasons set forth below, the court affirms the ITC's Third Remand Determination.


BACKGROUND

The facts of this case have been adequately set forth in the court's previous five opinions.  *See Nippon V*, 29 CIT at __, 391 F. Supp. 2d at 1258; *Nippon Steel Corp. v. United States*, 27 CIT __, 301 F. Supp. 2d 1355 (2003); *Nippon Steel Corp. v. United States*, 26 CIT 1416 (2002) (not reported in the Federal Supplement); *Nippon Steel Corp. v. United States*, 26 CIT 1025, 239 F. Supp. 2d 1367 (2002); *Nippon Steel Corp. v. United States*, 25 CIT 1408 (2001) (not reported in the Federal Supplement).  In *Nippon V*, the court remanded to the ITC its findings regarding the likely volume and impact of Japanese and Italian imports of GOES on the United States market in the event that the existing orders covering GOES were revoked.  *Id*. at __, __, 391 F. Supp. 2d at 1280, 1284; *see also* 19 U.S.C. § 1675a(a)(2), (4) (2000).  Pursuant to the court's instructions, the ITC re-opened the record and distributed supplemental questionnaires concerning the likely volume and impact issues.  On August 29, 2005, after the

ITC received all responses to those questionnaires, a vote was taken by five of the six sitting commissioners.  By a vote of three to two, the Commission found that revoking the orders would likely not lead to a continued or recurring material injury to the domestic industry.  *See* Third Remand Determination at 1. This determination was based largely on the Commission's finding that revocation of the orders would not lead to a significant increase in the likely volume of subject imports entering the United States.  *See id*. at 6.  This new volume finding was based, in turn, on the new evidence elicited by the supplemental questionnaires.  After factoring this new volume finding into its analysis, the Commission determined that the likely adverse price effects of the subject imports would fail to attain a significant enough level to preclude revocation of the orders.  *See id*. at 9. The new volume finding also led the Commission to conclude that any volume and price effects of the subject imports would likely not have a significant adverse impact on the domestic industry within a reasonably foreseeable time.  *See id*. at 10.  Defendant-intervenors now contest these most recent findings by asserting that: (1) the Third Remand Determination was invalid because it was not reached by the complete Commission membership; (2) revocation of the GOES orders would likely result in a significant increase in the volume of subject imports; (3) revocation of the GOES orders would likely have significant

adverse price effects on the domestic like product; and (4) revocation of the GOES orders would likely have a significant adverse impact on the domestic GOES industry. *See generally* Def.-Ints.' Comments on ITC Third Remand Determination ("Def.-Ints.' Comments").

## STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It "requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*

*(30)*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd.*, 744 F.2d at

1562).  The possibility of drawing two equally justifiable, yet

inconsistent conclusions from the record does not prevent the

agency's determination from being supported by substantial

evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

(1966); *see also Altx, Inc.*, 370 F.3d at 1116.


                              DISCUSSION

I.   Participation by the Complete Commission

     Defendant-intervenors initially insist that the Third Remand

Determination must again be remanded because the determination,

having been reached by only five of the six sitting

commissioners, was not the product of valid Commission action.

*See* Def.-Ints.' Comments at 1–8.


     At the time this matter was remanded to the Commission for

the third time, that body was undergoing a change in membership.

*See* Third Remand Determination at 1 n.3, 4; *see also* Def.-Ints.'

Comments at 6.  On September 6, 2005, Commissioner Marcia E.

Miller left the ITC and, on the same date, she was replaced by

Commissioner Shara L. Aranoff.  *See* Def.-Ints.' Comments at 6.

Commissioner Miller, however, was still a sitting commissioner at

the time the vote on the Third Remand Determination was taken.

*See* Def.-Ints.' Comments at Ex. 2; *see also* Third Remand

Determination at 1 n.3.  Despite being present, though,

Commissioner Miller did not participate in the vote.[2]


     Defendant-intervenors assert that "remands are to the

Commission as an institution and not to individual

commissioners."  Def.-Ints.' Comments at 2; *see also Asociacion*

*Colombiana de Exportadores de Flores v. United States*, 12 CIT

1174, 1176 n.2, 704 F. Supp. 1068, 1070 n.2 (1988) ("[R]emands

are made to the ITC, not to the individual commissioners.").

They understand this principle to mean that a decision reached by

a vote of less than the complete Commission membership, where

complete Commission participation is possible, renders the

resulting determination invalid.  Specifically, defendant-

intervenors argue that:

> [D]uring the entire period encompassed by the Court's
> remand – June 15, 2005, when this Court issued its
> decision [*Nippon V*], through September 13, 2005, when
> the Commission issued its [Third Remand Determination]
> – there was a full composition to the International
> Trade Commission consisting of all six members.  Even
> though the composition of the Commission changed during
> this period, at no time were less than six
> Commissioners officially members of the Commission. . .
> . [Thus,] [t]he remand decision here, reflecting the
> views of only five of the six Commissioners, is not the
> "institutional" response of all members of the
> Commission contemplated by the Courts. . . .

---

[2]     The Action Jacket to the Commission's Third Remand
Determination, which provides the voting record, simply
indicates, without further explanation, that Commissioner Miller
did not participate in the vote on the Third Remand
Determination.  *See* Def.-Ints.' Comments at Ex. 2.

Def.-Ints.' Comments at 6, 7.  Defendant-intervenors bolster their argument by claiming that Commissioner Miller's abstention may have affected the vote's outcome.  They cite Commissioner Miller's past affirmative votes as evidence that her participation could have produced a 3-3 tie in the voting, which consequently would have required the ITC to make an affirmative determination.[3]  *See* 19 U.S.C. § 1677(11); *see also* Def.-Ints.' Comments at 7 ("[I]n this case[,] . . . the failure of one commissioner to participate in the Commission's decision had a potentially determinative effect on the result.").

---

[3]      Under 19 U.S.C. § 1677(11):

If the Commissioners voting on a determination by the Commission . . . are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination.  For the purpose of applying this paragraph when the issue before the Commission is to determine whether there is——

   (A) material injury to an industry in the United States, [or]

   (B) threat of material injury to such an industry . . .

by reason of imports of the merchandise, an affirmative vote on any of the issues shall be treated as a vote that the determination should be affirmative.

19 U.S.C. § 1677(11).

While acknowledging that "remands are generally directed at the Commission as a whole and therefore require an institutional response from the Commission," the ITC argues that voting participation by all sitting commissioners is not mandated in every investigation.  Def. USITC's Resp. to Pls.' Objections to the USITC's Third Remand Determination ("Def.'s Resp.") at 3.  In support of this position, the ITC cites the Court of Customs and Patent Appeals'[4] ("C.C.P.A.") decision in *Voss International Corp. v. United States*, 628 F.2d 1328 (C.C.P.A. 1980), which interpreted 19 U.S.C. § 1330(c)(1) (1976) (current version at 19 U.S.C. § 1330(c)(6) (2000)).[5]  *See* Def.'s Resp. at 3.  The ITC claims that:

> [19 U.S.C. § 1330(c)(6)] specifically provides that a majority of the Commissioners in office constitutes a quorum of the Commission for purposes of Commission action, thus authorizing a majority of the Commissioners to take action on behalf of the

---

[4]     The Court of Customs and Patent Appeals served as the appellate forum for cases decided by this Court until September 30, 1982, at which time the United States Court of Appeals for the Federal Circuit ("Federal Circuit") assumed appellate jurisdiction.  *See South Corp. v. United States*, 690 F.2d 1368, 1368 (Fed. Cir. 1982).  In that case, the Federal Circuit held that "the holdings of our predecessor court[], . . . the United States Court of Customs and Patent Appeals, . . . shall be binding as precedent in this court."  *Id.*

[5]     Section 1330(c)(1) (1976) provided that, "[a] majority of the commissioners in office shall constitute a quorum, but the commission may function notwithstanding vacancies. . . ."  The current version, applicable in this case, 19 U.S.C. § 1330(c)(6) (2000), although contained in a different subsection, employs the same language.  Therefore, the interpretation provided by the C.C.P.A. in *Voss* is relevant to the instant analysis.

> Commission.  In fact, in *Voss International Corp. v.
> United States*, the Court of Customs and Patent Appeals
> . . . explicitly held that . . . an individual
> Commissioner may . . . abstain from voting on any
> matter before the Commission, as long as a quorum of
> the Commission is otherwise participating in the
> matter.

*Id.* (citations omitted).

An examination of § 1330(c)(6) and of the holding in *Voss,*
confirms the Commission's view.  Section 1330(c)(6) states that
"[a] majority of the commissioners in office shall constitute a
quorum, but the Commission may function notwithstanding
vacancies."  19 U.S.C. § 1330(c)(6).  Therefore, the statute is
clear in its instruction that valid Commission action requires
participation by only a majority of the sitting commissioners.
The statute's plain language supports the holding in *Voss*, where
the C.C.P.A. validated an ITC determination made by four of the
six sitting commissioners.  In *Voss*, one of the six commissioners
was absent when the ITC's action was taken, and the other, while
present, abstained from voting.  *See Voss*, 628 F.2d at 1333.
Nevertheless, the Court held that:

> A quorum of the members of the Commission can conduct
> the business of the Commission.  In the absence of
> statutory restriction, a majority of a quorum is
> sufficient to make a valid determination for the
> Commission.  Congress has expressly provided in [19
> U.S.C. § 1330(c)(6)] that a majority of the
> Commissioners in office shall constitute a quorum. . .
> .  By this language, we do not consider that Congress
> intended to compel a Commissioner present at a meeting
> to vote on every issue presented for determination.

> Abstention from voting is a legally permissible right
> often exercised by members of legislative and
> administrative bodies.

*Id*. at 1332 (citations omitted).  In addition, the *Voss* Court found that § 1330(c)(6)'s predecessor provision did not require a reviewing court to engage in an investigation aimed at uncovering a commissioner's reasons for not voting.  *Id*. ("[W]e do not consider that the courts are compelled by this language to probe the mental processes of a hearing officer or to inquire into the manner and method of administrative consideration of evidence to discern the reasons for the abstaining vote, i.e., whether it was for good cause.") (citations and internal quotation marks omitted).

Here, both the statute and the holding in *Voss* make clear that the Third Remand Determination was lawfully reached by a majority of a quorum of the sitting commissioners.  In addition, the abstention from voting exercised by departing Commissioner Miller was within her prerogative.  Thus, based on § 1330(c)(6) and the C.C.P.A.'s holding in *Voss*, the court finds that the Third Remand Determination was the product of valid Commission action.

II.  Likely Volume

Having found that the ITC's action with respect to the Third

Remand Determination was validly taken, the court now turns to

the substance of the ITC's findings.  Under 19 U.S.C. §

1675a(a)(1), a determination by the Commission as to whether the

revocation of an antidumping or countervailing duty order "would

be likely to lead to continuation or recurrence of material

injury [to the domestic industry] within a reasonably foreseeable

time," requires an examination of (1) the likely volume of

subject imports and their price effects should the orders be

revoked, and (2) the impact of the subject imports on the

domestic industry upon such revocation.  *See* 19 U.S.C. §

1675a(a)(2)-(4).  Section 1675a(a)(2), which sets forth the

criteria for determining the likely volume of subject imports in

the absence of an order, requires that:

> In evaluating the likely volume of imports of the
> subject merchandise if the order is revoked . . . the
> Commission shall consider whether the likely volume of
> imports of the subject merchandise would be significant
> if the order is revoked . . . either in absolute terms
> or relative to production or consumption in the United
> States.  In so doing, the Commission shall consider all
> relevant economic factors, including—
>
>> (A) any likely increase in production
>> capacity or existing unused production
>> capacity in the exporting country,
>>
>> (B) existing inventories of the subject
>> merchandise, or likely increases in
>> inventories,
>>
>> (C) the existence of barriers to the
>> importation of such merchandise into
>> countries other than the United States, and
>>
>> (D) the potential for product-shifting if

        production facilities in the foreign country,
        which can be used to produce the subject
        merchandise, are currently being used to
        produce other products.

19 U.S.C. § 1675a(a)(2).


    Following this court's instruction in *Nippon V*, the ITC re-
opened the record on third remand to obtain further evidence
regarding the likely volume of GOES imports into the United
States should the subject orders be revoked.  *See* Third Remand
Determination at 4.  The ITC analyzed this new information,
stating that:

    As we previously found, and the domestic producers do
    not dispute, the demand for GOES is dependent upon the
    demand for electricity.  While the record does not
    contain forecasts specific to increases in world-wide
    GOES demand, the record indicates that world-wide
    demand for electricity is expected to increase within
    the foreseeable future. . . .[6]

    Moreover, this evidence indicates that electrical
    demand [world-wide] is expected to increase at a
    greater rate than the expected increase in electrical
    demand in the United States. Thus, as we previously
    found, it is not likely that the subject producers
    would risk their access to other markets in order to
    sell significantly more GOES to the United States.

    [In addition,] overall demand in the United States for
    GOES has been strong, and is likely to continue to
    increase, in light of the demonstrated energy needs of

─────────────────────

    [6]    Specifically, "the domestic producers submitted
evidence that [[


                                                         ]]
which are primary markets for subject producers."  Third Remand
Determination at 6.

> the United States and the aging of the nation's
> transformers.  Overall, GOES demand has been increasing
> in recent years, . . . [and] [t]his upward trend will
> likely continue in the foreseeable future due to the
> aging infrastructure of the United States' electrical
> power generation and transmission systems and the
> likely increase in housing starts which will increase
> the need for power and distribution transformers,
> respectively. . . .  Apart from this likely increase in
> demand, the domestic industry is operating at virtually
> full capacity and has no specific plans to add capacity
> in the foreseeable future.

Third Remand Determination at 6-7, 8-9 n.26.  In other words, the

new information, when combined with previous data, indicates that

the predicted increase in world-wide demand for electricity will

deter the foreign producers from sacrificing their sales to other

markets to increase their GOES exports to the United States.

Moreover, increasing demand for electricity in the United States

will keep the domestic GOES industry running at near full

capacity and cancel out any adverse effects of the subject

imports on the U.S. market.  Therefore, the ITC found that "the

cumulated volume of subject imports would not increase

substantially if the orders [were] revoked." *Id*. at 5-6.


In addition to these findings based on the newly

supplemented record, the ITC adopted the prior dissenting views

of Vice Chairman Okun and Commissioner Hillman in Grain-Oriented

Silicon Electrical Steel From Italy and Japan, Invs. Nos. 701-TA-

355 and 731-TA-659-660 (Review) (March 2, 2001) ("Dissenting

Views").  The Dissenting Views analyzed the likely volume of

subject imports pursuant to the statutory factors set forth in 19

U.S.C. § 1675a(2) (A)-(D).

> First, neither the Italian nor Japanese producers have significant excess capacity that could be used to increase shipments to the U.S. market. . . . [Acciai Speciali Terni] reported that, as of December 2000, it was not accepting any new orders for delivery through May 1 2001. . . . With the exception of one year (1998), the Japanese industry operated at very high capacity utilization during the period reviewed. . . .[7]

> [Second,] the record contains no indication that there are any barriers to the importation of the subject merchandise into countries other than the United States.

> [Finally,] we do not find that there is any significant potential for product-shifting by the subject producers in favor of increased production of GOES. [Defendant-intervenors] argued that the subject producers could produce more GOES by switching some of their productive capacity from production of non-oriented electrical steel (NOES) to production of GOES. Although the two types of products, as well as other steel products, share a number of common production steps, there is a substantial production bottleneck presented by box annealing, which is specific to GOES production. Therefore, we do not find a likelihood of significant product shifting in favor of GOES production within a reasonably foreseeable time.

Dissenting Views at 22-23 (footnotes omitted).[8]

---

[7]    With respect to the amount and location of GOES inventories, the Dissenting Views noted that "the subject producers do not maintain significant inventories of GOES that could be used to increase market share in the United States. [Acciai Speciali Terni] reported no inventories of GOES in Italy. Inventories of GOES in Japan have been declining, and by September 2000 had fallen to [[       ]] short tons. There were [[   ]] inventories of GOES from Italy or Japan reported by any U.S. importer." Dissenting Views at 23.

[8]    The Dissenting Views also noted that the domestic
                                                  (continued...)

Defendant-intervenors challenge the ITC's likely volume determination as being unsupported by substantial record evidence. *See* Def.-Ints.' Comments at 9-10. Their chief contention is that the ITC's analysis failed to address adequately the significance of the likely volume of imports in terms "relative to production or consumption in the United States." 19 U.S.C. § 1675a(a)(2); *see also* Def.-Ints.' Comments at 11. According to defendant-intervenors, "the only discussion of any quantifiable figures on likely volumes from Japan and Italy during the period of review and future periods refers to capacity and capacity utilization levels, and export percentages, but these analyses [were] done in a vacuum and not vis-à-vis U.S. consumption or production." Def.-Ints.' Comments at 11. For defendant-intervenors, had the Commission engaged in a more detailed analysis of the effect of subject imports on the domestic industry in terms relative to U.S. levels of production or consumption, it would have found that "shifts in even a minor amount of third country exports to the United States or sales of even small amounts of excess capacity to the United States . . . could be significant." *Id.*

In addition, defendant-intervenors' point to what they claim

_____

[8](...continued)
industry's "capacity utilization was [[      ]] percent in interim 2000. . . ." Dissenting Views at 22.

is the ITC's "fail[ure] to address key evidentiary findings that

fairly detract[ed] from its conclusion." *Id*. at 10 (footnote

omitted). Specifically, defendant-intervenors insist that the

ITC "fail[ed] to consider express statements by importers and

purchasers that GOES exports from Japan and Italy to the United

States would increase if the orders were revoked." Def.-Ints.'

Comments at 12.[9] This argument is two-fold. First, defendant-

intervenors insist that the ITC was required to consider the

statements from domestic producers and importers concerning the

effect of revocation on the amount of Italian and Japanese GOES

exports previously destined for Canada and Mexico that could, in

_____

[9]     Defendant-intervenors specifically contend that:

> What the Commission failed to consider or
> address, however, was important record
> evidence from U.S. purchasers and importers
> specifically indicating that a shift back to
> the U.S. from sales to both Canada and Mexico
> would occur.  For example, importer [[
>
>
>                                          ]].
> Similarly, a number of purchasers and
> importers reported that if the orders were
> revoked and the duties lifted, they would
> pursue sourcing GOES from Japan and/or Italy
> and shift their sourcing requirements to
> these countries. . . .  (citing Purchasers'
> Questionnaire Responses of [[
>
>
>       ]]).

Def.-Ints.' Comments at 12-13.

the absence of the orders, be shipped to the United Sates. *Id*.

For defendant-intervenors, those statements demonstrate that

revocation of the orders would lead to these exports being

diverted to the United States, resulting in a significant

increase in the volume of subject imports into the U.S. market.

The second part of this claim is properly viewed as one seeking

application of the doctrine of "law-of-the-case."[10] Defendant-

intervenors insist that this court's holding in *Nippon V*, which

affirmed the ITC's conclusion that the subject producers were not

precluded from shifting the destination of their subject imports

from Canada and Mexico to the United States, estopped the ITC

from reaching a different conclusion in the Third Remand

Determination. *Id*. at 13; *Nippon V*, 29 CIT at __, 391 F. Supp.

2d at 1276 n.17.[11] Put another way, defendant-intervenors claim

that, because the court previously found that substantial

evidence supported the conclusion that the subject exporters

---

[10] The law-of-the-case doctrine "generally bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001) (citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). The doctrine "operates to protect the settled expectations of the parties and promote orderly development of the case[,] . . . ensures judicial efficiency and prevents endless litigation." *Suel v. Sec. of Health and Human Servs.*, 192 F.3d 981, 984–85 (Fed. Cir. 1999).

[11] There, this court stated that, "[b]ased on the evidence in the record, the court finds that the ITC has demonstrated with substantial evidence that these [[                ]] would not hinder the export of GOES to the U.S. in the foreseeable future." *Nippon V*, 29 CIT at __, 391 F. Supp. 2d at 1276 n.17.

would not be prohibited from shifting the destination of their GOES from Canada or Mexico to the United States should the orders be revoked, the ITC is at least required to explain why it now finds that "it is not likely that subject producers would risk their access to other markets in order to sell significantly more GOES into the United States."  Third Remand Determination at 7. Asserting that the ITC provided no such explanation, defendant-intervenors maintain that the Commission's likely volume determination was unsupported by substantial evidence and otherwise contrary to law.

Despite defendant-intervenors' claims, it is apparent that the ITC is justified in its conclusion.  First, a review of the ITC's analysis demonstrates that the likely volume of subject imports was addressed in terms relative to U.S. production and consumption.  Specifically, the evidence relied upon in the Dissenting Views, and that adduced in the Third Remand Determination, indicates that the expected strong U.S. demand for GOES will permit American GOES manufacturers to maintain their current levels of production, and thereby enable the domestic industry to offset any negative effects resulting from increased volumes of subject imports.[12]  *See* Dissenting Views at 24 ("[W]e

_____

[12]    As this court has previously held, "[i]n examining whether the ITC has satisfied the statutory injunction to
                                                        (continued...)

expect robust U.S. demand for GOES in the foreseeable future.

Thus, the U.S. market could absorb additional GOES imports

without displacing existing domestic suppliers."); *see also* Third

Remand Determination at 8 n.26 (finding that GOES demand in the

U.S. is expected to increase in the foreseeable future, and that

"the domestic industry is [currently] operating at virtually full

capacity . . . ."). The Commission made similar findings with

respect to consumption. Specifically, the Dissenting Views found

that, because "U.S. consumption of high permeability GOES fell

substantially between the original investigation and current

review period[,] . . . there is less demand [in the U.S.] for the

main product type . . . that Japan (which has . . . the larger

industry of the two subject countries) exported to the United

States . . . ." *See* Dissenting Views at 24.[13] That is, the

---

    [12](...continued)
consider whether the likely volume of imports of the subject
merchandise would be significant if the order is revoked . . .
either in absolute terms or relative to production or consumption
in the United States, it is not necessary to find that at each
point the ITC clearly labeled its findings by appending statutory
language as a marker." *Nippon Steel Corp. v. United States*, 26
CIT 1416, 1423 (2002) (not reported in the Federal Supplement)
(internal quotation marks omitted).

    [13]    The Dissenting Views further noted that:

        In the original investigations, [[    ]]
        percent of U.S. shipments of Japanese imports
        (which accounted for [[      ]] percent of
        U.S. consumption) and [[    ]] percent of
        U.S. producers' domestic shipments were high-
        permeability GOES. By contrast, over the
                                        (continued...)

Commission determined that downward trends in U.S. consumption of high permeability GOES, the type of GOES primarily exported by Japan and in smaller amounts by Italy, would serve to discourage the subject countries from shifting their subject imports to the United States.  *See* Dissenting Views at 23 n.17, 24.  Thus, the court finds that the Commission addressed the likely volume of subject imports in the event the orders are revoked in terms relative to both U.S. production and consumption.

Second, it is evident to the court that the ITC considered all of the record evidence, including the evidence that fairly detracted from its ultimate conclusion, i.e., the statements by GOES importers and producers dealing with the potential shift in imports from Canada and Mexico to the United States.  Indeed, the Commission's analysis acknowledged that "revocation might result in a small shift in subject imports from Canada and Mexico to the United States . . .," but determined that, should any shift occur, it was "unlikely to be significant because the subject producers . . . servic[e] several large multinational producers with production facilities in Canada and Mexico and [are]

---

[13](...continued)
    current review period, [[     ]] percent of
    U.S. producers' domestic shipments and very
    small quantities of Japanese and non-subject
    imports were high-permeability GOES.

Dissenting Views at 24 n.20.

therefore unlikely to jeopardize important transnational accounts simply to arbitrage price differentials between national markets." Def.'s Resp. at 8 (citations and internal quotation marks omitted); *see also* Third Remand Determination at 8-9 n.26.

Finally, the court holds that defendant-intervenors' law-of-the-case argument regarding the preclusive effect of this Court's prior rulings in subsequent remands is misplaced. As both this Court and the United States Court of Appeals for the Federal Circuit have held, because the standard applied by this court is "substantial evidence,"

> [the] "law of the case" argument is inapposite to the present situation. . . . [In the prior remand], we did not hold that certain of the conclusions in the first determination were correct as a matter of law. Rather, we held that certain conclusions were supported by substantial evidence and were otherwise in accord with law. Such a holding "is not necessarily inconsistent with a holding that the opposite conclusion[s] [were] also supported by substantial evidence and otherwise in accord with law."

*Taiwan Semiconductor Indus. Ass'n v. United States*, 24 CIT 914, 919, 118 F. Supp. 2d. 1250, 1254 (2000), *aff'd*, 266 F.3d 1339 (Fed. Cir. 2001) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube*, 975 F.2d 807, 814 (Fed. Cir. 1992)). Thus, these cases stand for the proposition that a finding by this Court that a portion of the ITC's determinations on a previous remand was supported by substantial evidence, does not prevent the Commission from lawfully reaching a different

conclusion on the same issue in a subsequent remand proceeding. *See id.*, 118 F. Supp. 2d at 1254; *see also* Def.'s Resp. at 9. That proposition is consistent with the well-settled principle that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620. (citations omitted). Moreover, the court notes that its finding in *Nippon V*, that nothing precluded the shift of GOES exports to the United States, was not a holding that such a shift would occur. *See Nippon V*, 29 CIT at __, 391 F. Supp. 2d at 1276 n.17. Put another way, because the court never held that revocation of the orders would lead foreign producers to forgo the sales of their merchandise to other markets in order to increase their exports to the United States, the ITC's finding on third remand was not in conflict with any previous court holding. Therefore, the court finds that the law-of-the-case doctrine did not prevent the Commission from reaching its decision in the Third Remand Determination.

Thus, the court affirms, as being supported by substantial evidence and otherwise in accordance with law, the ITC's finding that the likely volume of subject imports resulting from the revocation of the orders would not be significant.

III. Likely Price Effects

The next step in determining whether the revocation of an antidumping or countervailing duty order would likely lead to continued or recurring material injury to the domestic industry requires an evaluation of the likely effects of that revocation on the price of the domestic like product. *See* 19 U.S.C. § 1675a(a)(3).[14]  The ITC now finds no likelihood of significant adverse price effects should the orders be revoked despite this court's affirmation of its Second Remand Determination finding that revocation would likely result in significant adverse price effects. *See Nippon V*, 29 CIT at __, 391 F. Supp. 2d at 1281. The ITC's new conclusion, that "revocation of the orders . . . would not be likely to lead to significant underselling . . . or

---

[14]    This statute provides, in relevant part:

In evaluating the likely price effects of imports of the subject merchandise if the order is revoked . . . the Commission shall consider whether——

(A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and

(B) imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the domestic like products.

19 U.S.C. § 1675a(a)(3).

to significant price depression . . . within a reasonably

foreseeable time," stems, in large measure, from its new finding

that the volume of subject imports entering the United States in

the absence of the orders would not be significant.  Third Remand

Determination at 9.  In keeping with this new volume finding, the

ITC adopted the analysis set forth in the Dissenting Views.

> We have considered the likely degree of underselling by
> GOES from Italy and Japan and whether imports of such
> merchandise are likely to enter the United States at
> prices that would have a significant depressing or
> suppressing effect on the price of the domestic like
> product.  Given our expectation of a modest increase in
> the volume of subject imports . . . we would expect
> subject imports to have an effect on U.S. prices for
> GOES.  However, in the absence of significant volumes
> we would not anticipate significant price effects.
> Moreover, an expanding U.S. market for GOES would, in
> our view, permit the introduction of some additional
> import supply without having a detrimental impact on
> the U.S. pricing environment.

Dissenting Views at 25–26.


Defendant-intervenors challenge the ITC's conclusion that

revocation of the GOES orders would not result in significant

adverse price effects by claiming that the Commission improperly

relied on its erroneous finding that "the likely volume of

imports would not be significant."  Def.-Ints.' Comments at 14.

As a part of this argument, defendant-intervenors claim that the

Commission failed to consider all of the relevant record

evidence, particularly that which had been determinative in the

Second Remand Determination.  In addition, defendant-intervenors

again assert their "law-of-the-case" argument and claim that this court's holding in *Nippon V* is binding on the Commission and prevents the agency from reaching a different result in the Third Remand Determination. *See id*. at 15; *see also Nippon V*, 29 CIT at __, 391 F. Supp. 2d at 1281. Thus, defendant-intervenors ask that the court remand this issue in order to allow the ITC to reconsider its likely price effects finding and to conduct a more complete price analysis.

With respect to the argument that the Commission based its likely price effects finding on an improper likely volume finding, because the court has previously found the ITC's volume analysis to be supported by substantial evidence, it necessarily follows that this claim is without merit.

The court further finds defendant-intervenors' related assertion, i.e., that the Commission failed to take into account the evidence that led to its prior affirmative determinations, unconvincing. Upon a review of the ITC's likely price effects analysis as articulated in the Dissenting Views and supported by the new evidence marshaled in the Third Remand Determination, it is apparent that the Commission found that the new volume finding tipped the scales to a negative injury finding. That is, the Commission did not fail to consider the past evidence, but rather

undertook a *de novo* review of that evidence in light of the new evidence presented in the Third Remand, and came to a different conclusion. *See* Def.'s Resp. at 12. Indeed, "the . . . Commission majority joined the very same discussion of the evidence . . . that was set forth in the prior Commission's original views . . .," for instance, evidence relating to the substitutability of the Italian and Japanese product with domestic GOES,[15] however, "the Commission simply concluded that these . . . factors were offset by . . . record evidence showing that the volume of the subject imports was likely to be small upon revocation . . . ." *Id.* The Commission's *de novo* review, therefore, was predicated upon the Commission's new likely volume finding. Thus, given the small amount of imports expected to enter the United States upon revocation of the orders, the Commission concluded that any adverse price effects resulting from those imports would be insubstantial.

As to defendant-intervenors' claim that the Commission is estopped by the court's holding in *Nippon V* that its previous likely price effects finding was supported by substantial

---

[15]     The Dissenting Views specifically found that "limited price effects from GOES from Italy and Japan [resulted] because of . . . poor Italian-U.S. and Japanese-U.S. product substitutability." Dissenting Views at 25 n.23 (citing Grain-Oriented Silicon Electrical Steel From Italy and Japan, Invs. Nos. 701-TA-355 and 731-TA-660 (Final), USITC Pub. No. 2778 (May 1994) at I-27-30).

evidence, the court reiterates that the Commission is not bound by a prior ruling of the court that a portion of its prior findings was supported by substantial evidence where new remand proceedings reach a different conclusion, if that new conclusion is itself supported by substantial evidence. *See Consolo*, 383 U.S. at 620; *see also Taiwan Semiconductor*, 24 CIT at 919, 118 F. Supp. 2d at 1254; *Trent Tube*, 975 F.2d at 814. Therefore, although different from the prior sustained result, the Commission's price effects finding in the Third Remand Determination may be affirmed if, as here, it is supported by substantial evidence. *See Trent Tube*, 975 F.2d at 814.

Because the Commission's likely volume analysis has been found to be supported by substantial evidence, and because the Commission considered all of the record evidence in light of that finding, the court holds that the ITC's finding that significant adverse price effects would likely not result from revocation of the GOES orders is supported by substantial evidence and otherwise in accordance with law.

IV. Likely Impact

Finally, the court must analyze the Commission's determination on likely impact of subject imports "on the state of the industry in the United States . . . ."  19 U.S.C. §

1675a(a)(4).[16]  Here, the ITC once again articulates its finding

in the words of the Dissenting Views.  *See* Third Remand

Determination at 9.  Specifically, the ITC found that, since the

imposition of the orders, the domestic industry experienced

significant gains in both manufacturing capacity and GOES

---

[16]     The statute provides that:

> In evaluating the likely impact of imports of
> the subject merchandise on the industry if
> the order is revoked . . . the Commission
> shall consider all relevant economic factors
> which are likely to have a bearing on the
> state of the industry in the United States,
> including, but not limited to—
>
>> (A) likely declines in output,
>> sales, market share, profits,
>> productivity, return on
>> investments, and utilization of
>> capacity,
>>
>> (B) likely negative effects on cash
>> flow, inventories, employment,
>> wages, growth, ability to raise
>> capital, and investment, and
>>
>> (C) likely negative effects on the
>> existing development and production
>> efforts of the industry, including
>> efforts to develop a derivative or
>> more advanced version of the
>> domestic like product.
>
> The Commission shall evaluate all relevant
> economic factors described in this paragraph
> within the context of the business cycle and
> the conditions of competition that are
> distinctive to the affected industry.

19 U.S.C. § 1675a(4).

production, while GOES inventories simultaneously decreased.[17]

In addition, the ITC found that "the small volumes of subject

imports that were likely to enter the market upon revocation were

unlikely to have a significant impact on the condition of the

industry."  Def.'s Resp. at 13; *see also* Third Remand

---

[17]    Specifically, the Dissenting Views stated that:

> [D]omestic producers have increased their
> capacity and, more noticeably, their
> production since the imposition of the
> orders.  Capacity utilization is
> substantially higher than [[    ]] percent,
> and in recent years has been fully [[
>    ]] percentage points higher than in the
> early 1990s.  Demand is up, and U.S.
> producers have gained [[    ]] percentage
> points of market share since 1993.  Shipment
> volumes are up, even though average unit
> values are about the same as they were in the
> early 1990s.  Inventory levels have
> evaporated, and worker productivity is up.
> As a result, the domestic industry is posting
> operating income of more than [[    ]] per
> short ton, as opposed to operating losses of
> [[        ]] per short ton during 1992 and
> 1993.
>
> The domestic industry performance since 1997
> has continued to advance.  Volume-based
> indicators (output, sales, and inventory
> ratios) have improved, while value-based
> sales indicators have declined less rapidly
> than have costs and expenses.  As a result,
> the domestic industry's operating income
> margin increased from [[    ]] percent in
> 1997 to [[    ]] percent in 1999 and was [[
>    ]] percent in interim 2000, compared to
> [[    ]] percent in interim 1999.

Dissenting Views at 26-27 (footnotes omitted).

Determination at 9-10.  Based on these facts, the Commission found that, "if the subject orders were revoked, subject imports likely would not have a significant adverse impact on the domestic industry within a reasonably foreseeable time. Dissenting Views at 27; *see also* Third Remand Determination at 10 (stating that any minimal effect of the subject imports on the domestic industry would "not adversely impact the industry's profitability and ability to raise capital and maintain necessary capital investments.").

Defendant-intervenors' primary argument is that "the Commission failed to address [in its analysis] the capital-intensive nature of [the GOES] industry and the high costs associated with GOES production as factors that could mitigate the profitability the industry had experienced if capacity utilization levels declined."  Def.-Ints.' Comments at 16.  That is, defendant-intervenors insist that the increased volume of Italian and Japanese GOES upon revocation of the orders will diminish the demand for domestically produced GOES, thereby requiring U.S. GOES manufacturing plants to reduce production and assuring a substantial downturn in profitability among U.S. manufacturers.  *Id*.  The defendant-intervenors further claim that the ITC's failure to consider this assertion indicates a failure to consider evidence that fairly detracts from the ITC's finding.

*Id*.  For defendant-intervenors, therefore, the posited decrease in capacity utilization that would result from an increase in importation of Italian and Japanese GOES, would likely have a significant enough adverse impact on the domestic industry to warrant keeping the orders in place.

The court finds defendant-intervenors' arguments with respect to the Commission's likely impact finding unavailing.  A review of the Third Remand Determination demonstrates that the Commission took into account the effect of the volume of subject imports on the various economic conditions associated with the domestic GOES industry, specifically capacity utilization.  *See* Third Remand Determination at 9 ("After a review of the record, as supplemented, we adopt our prior findings with respect to likely impact . . . .  The new information obtained in the present remand . . . is not inconsistent with this finding."); *see also* Dissenting Views at 26–27 (noting that domestic GOES producers increased both their capacity and amount of production since the imposition of the orders.).  Further, the court notes that the Commission, pursuant to its new volume finding, directly stated that "[a]ny minimal effect on the industry's production, shipments, sales, market share, and revenues would not adversely impact the industry's profitability and ability to raise capital and maintain necessary capital investments."  Dissenting Views at

27; *see also* Third Remand Determination at 10.  In other words, the court agrees that, because of its likely volume and capacity utilization findings, the ITC has supported with substantial evidence its conclusion that the modest volume of subject imports expected to enter the United States would limit any adverse impact on the domestic industry's profitability and its ability to raise capital should the orders be revoked.

Based on the foregoing, the court affirms the ITC's determination that revocation of the GOES orders would likely not have a significant adverse impact on the domestic industry in the foreseeable future as being supported by substantial evidence and otherwise in accordance with law.

CONCLUSION

In accordance with the foregoing discussion, the court affirms the ITC's determination in Grain-Oriented Silicon Electrical Steel From Italy and Japan, Invs. Nos. 701-TA-355 and 731-TA-659-660 (Review) (Third Remand) USITC Pub. 3798 (September 13, 2005), and dismisses this case.  Judgment shall be entered accordingly.

                                              /s/Richard K. Eaton
                                                Richard K. Eaton

Dated:    May 9, 2006
          New York, New York